### Randolph E. SCOTT, Appellant,

v.

### UNITED STATES, Appellee.

### No. 04–CF–402.

District of Columbia Court of Appeals.

Argued Jan. 4, 2007.
Decided July 31, 2008.

Michael L. Spekter, Washington, DC, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, David B. Goodhand, and Roy Austin, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and BLACKBURNE–RIGSBY, Associate Judges, and SCHWELB, Senior Judge.

RUIZ, Associate Judge:

Following a jury trial, Randolph E. Scott was convicted of assault with a dangerous weapon, in violation of D.C.Code § 22–402 (2001), and first-degree sexual abuse, in violation of D.C.Code § 22–3002. On appeal, Scott argues that the trial court improperly limited his cross-examination of the complainant and erred in permitting the victim's six-year-old son to testify and to be led by the prosecutor during direct examination. He also contends that the evidence was insufficient to support his convictions, and that the two convictions merged. We conclude there is no reversible error and affirm.

## I. Factual Summary

In March of 2003, C.M. began a romantic relationship with appellant. Two months later, in May, she received a phone call from her former boyfriend, Antoine Turner, who asked C.M. if he could stay at her house for a while. C.M. agreed to let Turner stay with her, and Turner moved into C.M.'s house on June 2, 2003. A few days later, C.M. had a party at her home which spanned two or three days. Guests consumed alcohol and marijuana, and C.M. admitted at trial that she also used PCP during the party.

On Friday, June 6, while the party was still ongoing, appellant and Turner spent part of the day together away from C.M.'s home. When they returned, appellant told C.M. that he wanted to "see something" upstairs. C.M. accompanied appellant to the second-floor hallway, where he asked if she had sex with Turner since he had moved into her house, and called her a "ho." C.M. responded that even if she had, she had "already [taken her] bath and everything," and therefore appellant would not be able to determine whether she had sex with Turner.[1]

C.M. then entered the bathroom adjacent to the hallway, followed by appellant, who remained there while C.M. used the toilet. As C.M. was pulling her pants up, appellant slapped her on the face. C.M. fell to the floor as a result of the blow, and her earring came off as her face hit the bathtub. While C.M. stood up and argued with appellant, Turner, who was at the bottom of the staircase leading up to the hallway, told appellant not to argue with C.M. while her son, Michael,[2] was upstairs in the room next to the bathroom. Appellant left the bathroom to talk to Turner, and C.M. locked herself in the bathroom.

A few moments later, appellant knocked on the bathroom door and told C.M. that he wanted to talk to her, assuring her that he had no intention of harming her. C.M. opened the door, and appellant entered the bathroom, closing the door behind him. Saying that he wanted to examine her vagina, he punched her, ripped her pants and underwear off, and kicked her with his boots.[3] He knocked C.M. to the floor, inserted his fingers in C.M.'s vagina, and then smelled his fingers in an attempt to determine whether C.M. had engaged in sexual activity with Turner.

C.M. managed to escape from the bathroom and ran into her son's bedroom, where she attempted to hide in the closet. Appellant found her inside the closet and threw her to the floor. Michael, who had been sleeping, awoke as a result of the commotion, saw appellant hitting his mother, and tried to defend her by hitting appellant with his plastic toy sword. Meanwhile, Turner came into Michael's bedroom and, with knife in hand, got appellant out of the room, saying he should not be fighting in front of the child. Appellant and Turner then went downstairs together.

A few moments later, C.M. ran downstairs, without telling either man, and called the Metropolitan Police Department ("MPD") from her neighbor's house. C.M. told the responding officer, Deirdre Fisher, that her boyfriend "punched her in the face [and] . . . rammed his fingers in her vagina." According to the officer, C.M. was "upset, distraught, shaking, holding her side as if she was in pain." She was taken to Howard University Hospital for examination, where she reported that she was "physically and sexually assaulted by her significant other." The physical examination at the hospital revealed that C.M. had suffered abrasions and contusions on her body as well as in her genitals.

Appellant was not arrested on the evening of the assault, but he turned himself in a few days later, on June 9, 2003. At trial, C.M. and her son Michael testified about the events. The defense presented

---

1. During *voir dire,* C.M. said that she was having sex with Turner "behind [appellant's] back," and that she had been with Turner the week before she claimed appellant assaulted her.

2. Michael was five years old at the time of the incident and six years old when he testified at trial.

3. The fact that appellant was wearing boots while kicking C.M. served as the basis for the charge of assault with a dangerous weapon.

only a general denial of the events and appellant did not testify on his own behalf.[4] The jury convicted appellant of assault with a dangerous weapon (the boots) and first-degree sexual abuse.

## II. Analysis

### A. *Limits on Cross–Examination*

■ Appellant complains that the trial judge improperly precluded his cross-examination of C.M. with respect to her prior sexual experiences with Turner and her motivation to falsely accuse him. "The right to cross-examine the government's witnesses is inherent in a defendant's Sixth Amendment right of confrontation." *Jones v. United States,* 516 A.2d 513, 517 (D.C.1986) (citing *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). Denial of the right is therefore subject to harmless error review under the standard for constitutional error, *i.e.,* whether a reviewing court can conclude that the error is harmless "beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Once a "meaningful" cross-examination has been allowed, however, "this 'right is subject to reasonable limits imposed at the discretion of the trial judge.'" *Flores v. United States,* 698 A.2d 474, 479 (D.C.1997) (quoting *Scull v. United States,* 564 A.2d 1161, 1164 (D.C.1989)). "We review the trial court's rulings placing limitations on cross-examination for an abuse of discretion." *Bennett v. United States,* 876 A.2d 623, 632 (D.C.2005) (citing *Roundtree v. United States,* 581 A.2d 315, 323 (D.C.1990)).

### 1. *The Complainant's Prior Sexual History*

■ First, appellant argues that he was improperly precluded from exploring C.M.'s proclivity for "rough sex," and that he should have been able to explore the possibility that C.M.'s injuries resulted from consensual—but "rough"—sex with Turner and not from the alleged assault by appellant. The trial judge conducted *voir dire,* during which C.M. testified that she did not sustain any injuries when she had sex with Turner, and ruled that because there was no evidentiary foundation that C.M. had a previous injury, appellant's proposed inquiry into C.M.'s consensual sexual activities was impermissible under the Rape Shield Law.[5] The trial judge informed defense counsel, however, that he would be willing to *voir dire* Turner or accept any other evidence that would lay a foundation for the claim that C.M.'s injuries were not inflicted by appellant but were sustained as a result of C.M.'s and Turner's consensual sex. Defense counsel did not proffer any such evidence or request that Turner be called for *voir dire.*

Under the Rape Shield Law, D.C.Code §§ 22–3021 to –3022 (2001), "[i]n a sex offense case, evidence of a victim's sexual history with someone other than the defendant is generally inadmissible." *Bryant v. United States,* 859 A.2d 1093, 1104 (D.C. 2004). There are, however, limited exceptions, including for evidence of "[p]ast sexual behavior with persons other than the accused, offered by the accused upon the issue of whether the accused was or was not ... the source of ... bodily injury."

---

4. The defense called a single witness, a DNA analysis expert who had examined appellant's fingernail clippings and a vaginal swab from C.M. He testified that he did not find any of C.M.'s DNA on appellant's fingernails, nor did he find any of appellant's DNA in the vaginal sample. The expert characterized his findings as "non-probative."

5. The trial judge stated:
 the court is satisfied her testimony is she did not sustain any injuries; and, in fact, she didn't even go to the hospital emergency room. She checked herself. She examined herself or at least on the basis of her not having any pain, she decided that she didn't have any injuries.

D.C.Code § 22–3022(a)(2)(A).[6] The law provides a procedure for an *in limine* motion, "accompanied by a written offer of proof," and, "[i]f the court determines that the offer of proof contains evidence" admissible under the exceptions, "the court shall order a hearing in chambers to determine if such evidence is admissible." *Id.* § 22–3022(b)(1)–(2). "If the relevancy of the evidence which the accused seeks to offer in the trial depends upon the fulfillment of a condition of fact, the court . . . shall accept evidence on the issue of whether such condition of fact is fulfilled and shall determine such issue." *Id.* § 22–3022(b)(2). In other words, in order to present evidence under one of the exceptions, the defendant must have an evidentiary foundation—in this case, for the proposition that a prior sexual encounter could have caused the injuries in question. *See Brown v. United States*, 840 A.2d 82, 92 (D.C.2004) ("Evidence of prior sexual activity by the victim in a sexual abuse case 'should not be admitted except in the most unusual cases where the probative value [of the evidence] is precisely demonstrated.'") (quoting *McLean v. United States*, 377 A.2d 74, 79 (D.C.1977)); *see also State v. Harris*, 360 N.C. 145, 622 S.E.2d 615, 620 (2005) (no error in excluding evidence of consensual sex with someone other than defendant where there was no evidence to support the "inference that the victim's prior sexual activity was forced or caused any injuries"); *State v. Green*, 55 Conn.App. 706, 740 A.2d 450, 455 (1999) (no error in excluding evidence of prior consensual sex act where "no medical foundation for how consensual inter-course could be the source" of the injuries); *State v. Devers*, 2005 WL 724081, *6, 2005 Iowa App. Lexis 209, *15–17 (Iowa Ct.App.2005) (no error in excluding evidence of victim having sex with somebody other than defendant twelve hours prior to alleged assault because there was no evidence presented that the prior sexual activity was "rough, resisted, anything other than consensual, or that any injury resulted from such activity"). It is only after that threshold determination of relevance is made, that the trial court considers whether the probative value of the evidence outweighs its prejudicial impact and should be admitted. *See* D.C.Code § 22–3022(b)(3).

The trial court followed the procedure set out in the statute and held a hearing on appellant's motion to introduce evidence of C.M.'s alleged preference for "rough sex" with Turner as the cause of the injuries she blamed on appellant's assault. During *voir dire*, C.M. denied that she sustained injury from her consensual sex with Turner, a necessary precondition to its relevance to the accusation against appellant in this case. The trial court recognized the *potential* relevance of the proffer and expressed willingness to *voir dire* Turner and consider other evidence that might provide the necessary foundation. Defense counsel did not seek to *voir dire* Turner to establish that his sexual encounters with C.M. were particularly "rough," however, and appellant did not offer any evidence to support his claim that C.M.'s injuries were the result of her having engaged in rough sex with someone else.[7]

---

6. The other exceptions, not at issue here, are for evidence "constitutionally required to be admitted." D.C.Code § 22–3022(a)(1), and evidence of "[p]ast sexual behavior with the accused where consent of the alleged victim is at issue and is offered by the accused upon the issue of whether the alleged victim consented to the sexual behavior with respect to which such offense is alleged." *Id.* § 22–3022(a)(2)(B).

7. The trial court did not prevent appellant from presenting evidence about his own knowledge of C.M.'s preference for rough sex. According to his brief, appellant did not testify in this case because he had other sex abuse charges pending in an unrelated case.

The Rape Shield Law was enacted as a safeguard against unwarranted invasions of privacy and also serves to exclude legally irrelevant evidence that may distract the jury or lead it to discount the complainant's injury because of societal stereotypes and prejudices. *Cf. Bryant*, 859 A.2d at 1104; *see also Anderson v. Morrow*, 371 F.3d 1027, 1030 (9th Cir. 2004) ("A state passing a rape shield law makes a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy.") (internal quotation marks and citation omitted). The evidentiary foundational requirement is the bedrock of the protection of victims of sexual assault because it ensures that accounts of a complainant's prior sexual history are not admitted on tenuous or unjustified claims of "relevance." Without any evidentiary foundation that C.M.'s injuries could have resulted from her consensual acts, the Rape Shield Law precludes inquiry into C.M.'s sexual relationship with Turner.

Nonetheless, defense counsel was permitted to cross-examine C.M. about her relationship with Turner. C.M. acknowledged she had sex with him the week before the charged assaults and said that Turner had "beat [her] up," a point defense counsel stressed to the jury during closing argument. There was no medical testimony, however, that the rough sex C.M. admitted having had with Turner could explain the significant fresh bruises and contusions that were observed all over her body by the examining doctor immediately after the charged assault. Whatever the jury may have thought of C.M.'s sexual preferences, or her prior beating by Turner, it obviously concluded—in the face of that evidence—that appellant assaulted her in the manner that she and her son Michael described. Therefore, the trial court did not abuse discretion in limiting appellant's cross-examination. *See John-*

*son v. United States*, 398 A.2d 354, 367 (D.C.1979) (noting that it is only when an error in the exercise of discretion requires reversal because of prejudicial impact on the defendant, "that we hold that the trial court 'abused' discretion").

### 2. The Complainant's Bias

Appellant also challenges the trial court's ruling disallowing cross-examination to explore the reason for C.M.'s "recantation of the recantation" when she reaffirmed that appellant had forcibly sexually assaulted her. The facts as gleaned from C.M.'s trial testimony as well as *voir dire* outside the presence of the jury are that on the night of the incident, June 6, C.M. told Officer Deirdre Fisher that appellant had "rammed his fingers in her vagina." She repeated this account when she was taken to the hospital for evaluation, telling the attending physician that she had been "physically and sexually assaulted." Likewise, the first time C.M. appeared before the grand jury, on June 11, she testified that appellant had forcibly inserted his fingers. Two days later, however, C.M. gave a statement to appellant's defense counsel that she had permitted appellant to insert his fingers inside her ("[appellant] didn't do anything harmful to me;" "I let him do it"). C.M. returned to the grand jury on June 16, and contradicted herself at various points during her testimony, *stating both that she gave appellant permission to do so and that she did not give him permission.*

At trial, C.M. testified on direct examination, consistent with her initial reports to the police and the doctor, that appellant forcibly assaulted her, without her consent. Before cross-examining the complainant, defense counsel informed the trial judge that he intended to inquire into the motivation behind C.M.'s decision to return to the grand jury and abandon the statement she

had given to the defense recanting her accusation. The defense sought to argue that C.M. changed her mind and returned to the grand jury to testify that appellant sexually assaulted her only because "she felt threatened or coerced into changing her story because she was threatened with losing her children." During the course of an extensive *voir dire* on the question of whether C.M. was coerced into disavowing her recantation of her accusation because she was threatened by the government, C.M. said that she had been at the courthouse at the request of appellant's defense team and that, while there, she had told them that she had consented to appellant's examination of her vagina; according to defense counsel, she gave a thirteen-page statement to that effect. The prosecutor also saw her at the courthouse and asked if she would return to the grand jury, to which she agreed. C.M. testified that Deidre Smith, the victim's witness advocate of the U.S. Attorney's Office, told her that "changing [her] story could be perjury ... [and that she] could be convicted." Smith also told her that she risked losing her children if she continued to use PCP, and encouraged her to seek treatment. C.M. testified that she was never "threatened ... in any way with respect to what [she said] ... [at] any time during the grand jury process." Her testimony on how she perceived her situation, however, was ambiguous. Initially she stated that she did not change the story because she was worried about losing her children, and that she had recanted her accusation because she did not "want [appellant] to do time for [her]." Although at one point she said that she was not concerned "about ... the fact that [she] had changed her story ... could [lead to] los[ing her] kids," she later conceded that, if she were convicted for

perjury, she would lose contact with her children just as she would if she were convicted of using PCP.

The trial judge did not permit this line of cross-examination into C.M.'s possible motive for disavowing her recantation on the ground that it would lead to evidence that was substantially more prejudicial than probative:

[N]o one really threatened her from the U.S. Attorneys Office to testify as she did. They may have mentioned consequences such as ... she will be separated from [her children] ... As she also testified there was fear of perjury that she didn't consider much as a reason for losing her children ... the court does not see any evidence that the government forced, compelled her to testify as she did the second time in front of the grand jury on February 16th ...

My ruling is therefore ..., that as far as any risk that she would lose her children, that is not going to be mentioned. She is not going to be asked questions about that. The relevance of that, even within the context of how it's being offered is less relevant and more prejudicial to the government's case. The essence is that the jury again will hear that she recanted and that's the crucial aspect of it.

▪▪▪ The exposure of a witness's motivation in testifying is "[a] proper and important function of the constitutionally protected right of cross-examination." *Delaware v. Van Arsdall,* 475 U.S. 673, 678–79, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Cross-examination for bias[8] can be so important to the protection of a defendant's constitutional rights that we have said that "[b]ias is *always* a proper subject of cross-examination.'" *Scull v. United States,* 564 A.2d 1161, 1165 (D.C.1989) (citing *Springer*

---

**8.** "Bias" encompasses both a witness's personal bias for or against a particular party as well as the witness's motive to testify in a

certain way. *See, e.g., McCloud v. United States,* 781 A.2d 744, 752 (D.C.2001).

*v. United States,* 388 A.2d 846, 855 (D.C. 1978)) (emphasis added). If the defendant is precluded from pursuing a "meaningful" degree of cross-examination, such as excluding a specific line of questioning altogether on an issue such as bias, the government has the burden of establishing that the error was harmless beyond a reasonable doubt. *See Chapman,* 386 U.S. at 24, 87 S.Ct. 824 (1967).

■ We also recognize, however, that the trial judge has discretion in determining whether particular evidence is relevant to bias or motive. *See* McCormick on Evidence § 40, at 87 (3d ed. 1984). "Indeed, the trial court has a great deal of discretion in making this determination." *Coles v. United States,* 808 A.2d 485, 490 (D.C.2002). "[T]he burden of showing the relevance of particular evidence to the issue of bias rests on its proponent." *Id.* (quoting *Chambers v. State,* 866 S.W.2d 9, 26–27 (Tex.Crim.App.1993)).

■ Evidence relevant to bias should be admitted unless "its probative value is substantially outweighed by the danger of unfair prejudice." *Ebron v. United States,* 838 A.2d 1140, 1148 (D.C.2003) (internal quotation marks and citation omitted). "The probative/prejudice analysis is quintessentially a discretionary function of the trial court, and we owe a great deal of deference to its decision." *Id.* at 1152 (internal quotation marks and citation omitted). "An exercise of judicial discretion will not be reversed unless it appears that it was exercised on grounds, or for reasons, clearly untenable or to an extent clearly unreasonable." *Id.* at 1153 (internal quotation marks and citation omitted).

Here, the trial judge did not abuse discretion in foreclosing cross-examination into C.M.'s motivation for changing her version of the events after conducting a comprehensive *voir dire* of the witness. Although the defense's proposed line of questioning for bias was plausible in theory, *see Thomas v. United States,* 824 A.2d 26, 32–33 (D.C.2003) (noting that the jury can, through common sense infer that a witness with children would not want to be convicted of perjury because she would not want to lose custody of her kids), in this case, the probative value of the evidence the defense wanted to elicit was limited. As the trial judge noted, in response to specific questions C.M. said she was not threatened and, although there seems to have been some confusion in her mind about the use of the phrase "losing her kids," she testified that she did not disavow her recantation out of fear of losing her children. Even though knowing the reason why C.M. changed her story would have been useful to the jury's assessment of her trial testimony, C.M. maintained during *voir dire* (and presumably she would have repeated before the jury) that she was not motivated to falsely accuse appellant because she feared losing her children. Most importantly, the jury was presented with C.M.'s recantation of her accusation against appellant, and was made aware that C.M. had twice made statements—once under oath to the grand jury—that completely exculpated appellant by denying the allegation at the core of the sexual abuse charge, that appellant had forcibly inserted his fingers in her vagina.[9]

9. Defense counsel cross-examined C.M. before the jury about her exculpatory statements to the defense as well as her testimony during her second appearance before the grand jury, that she had permitted appellant to insert his fingers in her vagina. On redirect examination C.M. testified that she had reverted to the truthful version—the one she had given during her first appearance before the grand jury—that appellant sexually assaulted her, because she had been told she could be prosecuted for perjury if she testified untruthfully. The jury was also aware from the testimony of other witnesses of the corroborating accusato-

The jury was thereby informed of C.M.'s contradictory pre-trial statements from which it could have decided to disbelieve her testimony at trial. Compared to this evidence of her actual recantation, the probative value of evidence of bias that could have resulted from the proffered cross-examination was relatively slight.[10]

If that were the end of the analysis, the defendant's right to meaningfully confront his accuser by exposing her potential bias would weigh heavily in favor of permitting the defense's proposed bias cross-examination. But here, the probative value of the bias cross-examination was, as the trial judge noted, outweighed by its potential for prejudice because it suggested, without a factual foundation, that the government was strong-arming the complaining witness to present a particular version of events, which could have had the effect of casting the prosecutor in a negative light and unjustifiably tainted the prosecution's case overall. The suggestion appears unfounded because this is not a case where the complainant accused the defendant only *after* being threatened with a perjury prosecution. Rather, she was informed of the possible consequences of perjury when she abruptly changed the story she had consistently maintained—that appellant had sexually assaulted her—when she called the police and went to the hospital immediately after the incident, and when she testified for the first time before the grand jury. Given the relatively slight probative value of questions about C.M.'s possible bias in light of the thorough impeachment at trial with her inconsistent statements, and the cross-examination's potential to unfairly prejudice the government's prosecution, the trial judge did not abuse discretion in precluding the cross-examination for bias.

## B. Testimony of Child Witness

Appellant also contends that the trial court erred in admitting the testimony of C.M.'s six-year old son, Michael, arguing that he was incompetent to testify and was impermissibly led by the prosecutor during direct examination.

■■■ "Two requirements must be satisfied before a child witness can be found competent to testify: (1) the child must be able to recall the events which are the subject of the testimony; and (2) the child must understand the difference between truth and falsehood and appreciate the duty to tell the truth." *Barnes v. United States*, 600 A.2d 821, 823 (D.C.1991). "This court will not disturb the trial court's decision unless it is clearly erroneous, recognizing that the trial court has the

---

ry statements she made to the police and at the hospital on the night of the incident.

**10.** The government suggests in passing that evidence that the complainant changed her story because she was motivated by fear of losing her children was irrelevant because the defense theory at trial was not consent, but a general denial. If appellant had argued at trial that C.M. had consented to his vaginal inspection, the government argues, C.M.'s recantation—and the reason why she changed her story, and then reverted to her original accusation—would be probative because it would bear on the likelihood on which version of the events was true, *i.e.*, whether C.M. gave permission or whether there was a forc-

ible penetration. But if the defense was a general denial, not consent, evidence tending to show that appellant was given permission to insert his fingers inside C.M. would not make appellant's version of the events more likely.

We note, however, that when the trial judge excluded inquiry into C.M.'s motivation for recanting her recantation, the defense had not committed to a general denial or a consent defense by arguing either to the jury during opening argument. The court's ruling, in other words, may itself have been a factor in formulation of the defense. Therefore, we do not accept the government's argument that the evidence would have been irrelevant.

opportunity to observe the witness' demeanor and conduct at trial." *Id.*

Prior to trial in this case, the trial judge conducted a *voir dire* of Michael and ruled that he was competent to testify. The trial judge specifically found that Michael was able to recall the events of the attack and could differentiate between falsehood and truth.

Appellant's sole argument as to why Michael was incompetent to testify is that his testimony during *voir dire* was inconsistent with his testimony at trial on the issue of whether his sister was present during the attack on the complainant. The record demonstrates no inconsistency. The transcript of the *voir dire* shows that Michael testified that his sister was in his bedroom when appellant was hitting his mother, and the trial transcript shows that he similarly testified that his sister was present during the attack. Appellant cites no other purported inconsistency in the child's testimony. Without any evidence in the record to support that Michael's *voir dire* testimony contradicted his testimony at trial, we have no basis to conclude that the trial judge's finding that Michael could accurately recall the events was "clearly erroneous."[11]

Appellant also argues that the prosecutor asked Michael leading questions during direct examination. Prior to trial, Michael had described the attack he witnessed against his mother during a videotaped interview. During the inter-

view, Michael said that appellant kicked his mother with his boots, but at trial Michael testified during direct examination that he saw appellant hit C.M. "with his fists." When asked whether appellant used "anything else" during the attack, Michael responded "no." The prosecutor then approached the bench and informed the judge that he could proceed in either of two ways: (1) by impeaching Michael with the videotaped statement indicating that appellant kicked C.M.; or (2) by leading Michael by asking "did [appellant] also kick your mommie?." The trial judge permitted the prosecutor to ask the leading question, to which Michael responded in the affirmative. Appellant objected to the question and on appeal continues to complain that it was error to permit the prosecutor to lead the child witness.

"Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." *Bailey v. United States,* 831 A.2d 973, 984 (D.C. 2003) (quoting Fed. R. Evid. 611(c)). "The trial court, however, has fairly broad discretion to allow leading questions to be asked, and reversal is usually not required if the record shows that the court exercised that discretion." *Id.* (citing *Green v. United States,* 121 U.S.App. D.C. 111, 112, 348 F.2d 340, 341 (1965)). "[A] hostile witness, an adverse party, or a witness identified with an adverse party may be

---

11. To the extent appellant argues that C.M.'s testimony that her daughter was not present during the attack demonstrates that Michael was unable to accurately recall the events, we do not view that inconsistency as grounds for concluding that the trial court's finding was "clearly erroneous." The trial judge was aware of the complainant's testimony that Michael's sister was not present during the attack and still found that Michael was sufficiently able to recall the events to be a competent witness. The trial judge noted that Michael was able to remember that it was

nighttime when the attack took place, that appellant was the attacker, that the attack took place in his bedroom and nearby bathroom, and that he used his plastic sword to hit appellant. Given the detailed nature of Michael's recollection, the single potential inaccuracy of his sister's presence is *insufficient* to characterize the trial court's finding as "clearly erroneous." The inconsistency between C.M.'s recollection and Michael's was something the jury could consider in evaluating their credibility.

interrogated by a leading question." *Jenkins v. United States,* 500 A.2d 1019, 1021 n. * (D.C.1985) (quoting 2 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 415 at 531–32 (1982)). "This situation includes not only the case of witnesses hostile, biased, or interested, by their sympathies, with the opponent's cause, but also of witnesses *unwilling* for any other reason to tell all they may know...." 3 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 774 (CHADBOURN REV. 1970).

We discern no error in the face of a clear exercise of judicial discretion. Although we have previously urged the "judicious[ ]" exercise of discretion in permitting leading questions to suggestible witnesses, we have, at the same time, recognized that "it is often necessary to use leading questions in the case of young witnesses." *Scott v. United States,* 412 A.2d 364, 371 (D.C.1980). The witness on the stand was the complainant's young child, who, was five-years-old at the time of the attack and six at the time of trial, and due to his age, may have required a leading question to fully stimulate his recollection. *See* WIGMORE § 778; *see also United States v. Flute,* 363 F.3d 676, 678 (8th Cir.2004) ("[W]hile leading questions are generally prohibited on direct examination, the child witness is a long-recognized exception to this rule.") (internal quotation marks and citation omitted). Once Michael said "no" when asked whether appellant had used anything other than his fists during the attack, he demonstrated that he was unwilling to disclose all that he knew, and the prosecutor was therefore permitted to ask him a leading question on the precise issue. Moreover, if the leading question had not been allowed, the alternative course, to impeach Michael with his prior inconsistent statement, likely would have prompted the same response. On this record, we conclude there is no abuse of discretion.

## C. *Sufficiency of the Evidence*

Appellant also argues that the trial court erred in denying his motion for judgment of acquittal. He maintains that the complaining witness's testimony was inherently incredible because (1) she was under the influence of PCP, alcohol, and marijuana at the time she claimed appellant assaulted her, and (2) she recanted her accusation that appellant had sexually assaulted her.

"We review a trial court's denial of a motion for judgment of acquittal *de novo,* and like the trial court, determine whether the evidence, viewed in the light most favorable to the government, was such that a reasonable juror could find guilt beyond a reasonable doubt." *Johnson v. United States,* 756 A.2d 458, 461 (D.C.2000) (citing *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987)). "In recognizing the jury's role in weighing the evidence, we will defer to its credibility determinations, as well as its ability to draw justifiable inferences of fact." *Id.* (citing *Patton v. United States,* 633 A.2d 800, 820 (D.C.1993)).

Reviewing the record, we are satisfied that there was ample evidence from which a reasonable juror could have convicted appellant of sexual assault and assault with a dangerous weapon. C.M. testified at trial that appellant ripped her clothes off and forcibly inserted his fingers inside her vagina, and then kicked her with his boots. Her story was corroborated by physical evidence, her ripped pants and appellant's boots, which were admitted into evidence. Her son Michael corroborated that appellant beat and kicked her. The medical testimony also confirmed that she had been beaten and sexually assaulted in the manner she described. C.M.'s version of events was not inherently incredible and the jury was not presented with a competing plausible explanation for her injuries.

The questions appellant raises about C.M.'s credibility—her drug consumption and recantations—were fully aired before the jury, which nonetheless, decided to believe C.M.'s testimony that appellant assaulted her. This court may not second-guess the jury's credibility determination. *See In re S.G.,* 581 A.2d 771, 774–75 (D.C. 1990). Viewing the evidence in the light most favorable to the government, we conclude it was sufficient to establish that appellant assaulted her sexually and with a dangerous weapon. Therefore, the trial judge did not err in denying appellant's motion for judgment of acquittal.

### D. *Merger*

▮▮▮▮ Appellant's final contention is that his convictions for assault with a dangerous weapon and first-degree sexual abuse merge. Although the Double Jeopardy Clause of the Fifth Amendment prohibits multiple punishments for the same offense, whether a single event or transaction may be punishable as more than one offenses depends on legislative intent. As a proxy for divining legislative intent, the Supreme Court in *Blockburger v. United States* held that in the absence of clear legislative intent to the contrary, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (citation omitted). "[I]n applying this test, the court looks at the statutorily-specified elements of each offense and not the specific facts of a given case as alleged in the indictment or adduced at trial." *Joiner-Die v. United States,* 899 A.2d 762, 766 (D.C.2006) (quoting *Byrd v. United States,* 598 A.2d 386, 389 (D.C.1991) (en banc)).

Applying *Blockburger,* we conclude that appellant's convictions do not merge be-cause each conviction requires an element the other does not require. The sexual assault statute requires a "sexual act," which is not required for a conviction of assault with a deadly weapon. The assault with a deadly weapon statute requires use of a "dangerous weapon," which the sexual assault statute does not require. *Compare* D.C.Code § 22–402 *with* D.C.Code § 22–3002. Therefore, appellant's convictions do not merge.

Accordingly, the judgment of the trial court is

*Affirmed.*