**Melvin T. WATTS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 06–CF–263.

District of Columbia Court of Appeals.

Argued Nov. 14, 2008.

Decided May 21, 2009.

Corinne Beckwith, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Ann K. Simon, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Gregory G. Marshall and Allison Harnisch Leotta, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, BLACKBURNE–RIGSBY and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Following a ten-day trial before the Honorable Judith Retchin, a jury convicted appellant Melvin Watts of one count of carjacking (D.C.Code § 22–2803) (2001); one count of kidnapping (D.C.Code § 22–2001) (2001); one count of felony threats (D.C.Code § 22–1810) (2001); one count of first-degree sexual abuse (D.C.Code § 22–3002(a)(1)) (2001); one count of third-degree sexual abuse (D.C.Code § 22–3004(1)) (2001); one count of armed aggravated assault (D.C.Code §§ 22–404.01, –4502) (2001); and one count of armed assault with intent to kill (D.C.Code §§ 22–401, –4502) (2001). We affirm the judgments of conviction.

## I.

K.H., the primary prosecution witness, described to the jury her violent encounter with appellant on November 17, 2004. At about 5:30 a.m., she was sitting in her car with her five-year-old daughter and her seven-year-old son, waiting for the engine to warm up before she dropped the children off at her mother's house and drove to work. Appellant, whom K.H. had seen "a few times" in her neighbor's yard,

"came out of nowhere and got into the front seat" of the car. In an angry voice, he ordered her to drive off and, frightened, she complied. When they reached a dead-end, appellant put a knife to her throat and ordered her to put the children in the trunk. K.H. refused and, after a struggle, succeeded in getting the knife away from appellant. The children, crying at this point, let themselves out of the back passenger-side door. Appellant shifted to the driver's seat, held K.H. in the car and drove off. Speeding, the car got into an accident moments later, but appellant continued to drive with his left hand while holding K.H. down in the back seat with his right hand and threatening to kill her. They eventually stopped at a recreation center parking lot, and appellant pulled K.H. out of the car by her collar and forced her into the trunk before driving off again. At their final stop, appellant took K.H. out of the trunk, ripped off one leg of her pants and her underwear, and began rubbing his penis against her crotch. Eventually, he got K.H. onto the ground and began "humping and humping" with his penis penetrating her vagina. Thereafter, appellant took a metal bar out of the trunk and hit K.H. in the head several times until she blacked out. K.H.'s next memory was of finding herself alone in the woods, slowly walking towards the street to get help, and ultimately collapsing on the stairs of a house, where she remained until police and an ambulance arrived.

Mary Pinn, a sexual assault nurse examiner, examined K.H. on the day of the incident and also interviewed her about the assault, recording K.H.'s answers on a Victim's Medical History and Assault Information form ("the VMHAI form").[1] K.H. told Pinn that a man whom she did not

---

1. As explained *infra,* a redacted version of this form was admitted as a government exhibit.

know had vaginally penetrated her with his penis and hit her with a tire iron.[2] Although Pinn observed that K.H. had suffered numerous non-genital injuries, she found no symptoms of trauma to K.H.'s genitalia. Pinn swabbed Homes's vaginal and anal areas, and, upon analysis, the swabs tested positive for semen. DNA analysis showed that appellant was the source of the semen.

The defense theory of the case was that appellant and K.H. not only knew one another prior to the November 17 incident, but had previously been involved in a consensual sexual relationship. In particular, the defense argued that, although K.H. had a boyfriend, she engaged in consensual intercourse with appellant on November 15, 2004, on which occasion appellant deposited his semen in her body. Two days later, according to the defense, K.H. started to give appellant a ride to his job (at a construction site) at about 5:30 in the morning. The November 17 meeting began amicably, but the couple soon started fighting in the car, and appellant (by his own admission) beat K.H. with a tire iron. But aside from that assault, the defense contended, appellant committed no offenses against K.H. The defense argued that K.H. fabricated the sexual assault and other charges to hide from her boyfriend the fact of her affair with appellant.

Appellant did not testify, but, in support of the defense theory, defense counsel focused on a number of inconsistencies between K.H.'s trial testimony and her prior statements to detectives and to the grand jury about the details of the assault. The defense also presented evidence that, while appellant was visiting his sister in South Carolina during October 2004, several calls

had been placed to K.H.'s phone number from appellant's sister's cell phone, including one call that was eighteen minutes long.[3] In addition, in cross-examining the government's DNA expert Kristina Losquadro, defense counsel elicited testimony that the only semen found on K.H.'s vaginal and anal swabs was that of appellant. Losquadro agreed that "if someone had consensual intercourse with ejaculation within a three-day period [prior to the taking of a vaginal swab], you would expect to find some male DNA in a vaginal swab" because "once intercourse has taken place, semen remains for . . . approximately 72 hours." She added that this would "depend on the circumstances of the intercourse or sexual activity" such as "[i]f the individual wore a condom; if the individual had a vasectomy, obviously you're not going to find any semen in that vaginal cavity."

Appellant further sought to present K.H.'s statement, on the VMHAI form in response to Question 15, that she had engaged in "consensual coitus" without a condom on the morning of November 15, 2004. Judge Retchin excluded this evidence, however, and precluded defense counsel from cross-examining K.H. about the statement, concluding that such evidence was inadmissible under the District of Columbia's "Rape Shield Law" (D.C.Code § 22–3022 (2001)). K.H.'s answer to Question 15 was redacted from the copy of the VMHAI form that was admitted into evidence.

## II.

 Appellant first argues that the trial court committed reversible error in refus-

---

**2.** Pinn recorded K.H.'s answer by checking a box, in answer to VMHAI form Question 20, indicating that K.H.'s assailant was a "stranger."

**3.** K.H. also admitted on cross-examination that she had, on one occasion, spoken with appellant when he offered her some food.

ing to admit K.H.'s statement that she engaged in unprotected "consensual coitus" on November 15 (*i.e.*, two days before the November 17 incident). He contends that K.H.'s statement, combined with (1) testimony by the government's expert that semen usually remains inside a woman's body 72 hours after being deposited, and (2) the absence of evidence of another man's semen on K.H.'s vaginal swab obtained on November 17, identifies appellant as K.H.'s November 15 consensual-sex partner.[4] Appellant argues that the excluded statement would thus have provided the jury with an innocent explanation for the presence of his DNA on K.H.'s (uninjured) genitalia: the possibility that appellant left his semen in K.H.'s body during a November 15 consensual act, not during the November 17 assault.[5] Accordingly, appellant contends, the excluded prior-sexual-act evidence was "critical" to his defense and implicated his Fifth Amendment right to due process and his Sixth Amendment right to confrontation, such that it should have been admitted under the "constitutionally required" exception to the Rape Shield Law's general prohibition against admitting evidence of a victim's sexual history. *See* D.C.Code § 22–3022(a)(1).

■ The Rape Shield Law generally precludes introduction of "evidence of a [sexual assault] victim's past sexual behavior." D.C.Code § 22–3022(a) (2001). Evidence of past sexual behavior may be admissible, however, if it is "constitutionally required to be admitted," [6] D.C.Code § 22–3022(a)(1), and if the procedural requirements of D.C.Code § 22–3022(b) have been satisfied. Section 22–3022(b) requires a criminal defendant seeking to put such evidence before the jury to make a written motion seeking admission, accompanied by a written offer of proof, which entitles the defendant to an *in camera* hearing on the issue if the judge determines that the written offer of proof "con-

4. Defense counsel argued that:
 [A]s I understand both the scientific literature and the expert that we have spoken to, when a person has sexual intercourse, that DNA from semen can be found up to 72 hours [later] [and] certainly within 48 hours.... In this case, both the FBI's information and our independent lab found ... only DNA from Mr. Watts.... [Since K.H. said she had consensual sex] within a 72–hour time period, and probably within the 48–hour time period, [and] given that she had sex without a condom ... one would expect to find DNA from whoever that partner was ... I think [this] clearly and fairly strongly suggests that whoever she had sex with on that Monday morning, 48 hours previously, was Mr. Watts because there is no mix of DNA.

5. Appellant also argues that "[p]roof that the DNA evidence was the result of consensual sex and proof that K.H. was dishonest about not knowing Melvin Watts could have completely destroyed her credibility and severely damaged the government's standing with the jury."

6. Other exceptions permit the introduction of evidence of "[p]ast sexual behavior with the accused where consent of the alleged victim is at issue and is offered by the accused upon the issue of whether the alleged victim consented to the sexual behavior with respect to which such offense is alleged," D.C.Code § 22–3022(a)(2)(B); and evidence of a victim's past sexual behavior with someone other than the defendant, where the evidence is offered to establish that someone other than the accused is the source of semen or bodily injury. D.C.Code § 22–3022(a)(2)(A). The defense did not rely on these exceptions in the trial court. In particular, defense counsel did not rely on section 22–3022(a)(2)(B). The defense theory was that there was no sexual contact between appellant and K.H. on November 17, and that the presence of appellant's semen on the vaginal swab taken from her on November 17 was explained by the two having had consensual sex on November 15.

tains evidence described in subsection (a) of this section." D.C.Code § 22–3022(b)(2) (2001). Defense counsel's burden at this hearing is to "precisely demonstrate[ ]" the probative value of the evidence it seeks to present. *See Scott v. United States*, 953 A.2d 1082, 1088 (D.C.2008) (quoting (Larry) *Brown v. United States*, 840 A.2d 82, 92 (D.C.2004) ("Evidence of prior sexual activity by the victim in a sexual abuse case should not be admitted except in the most unusual cases where the probative value of the evidence is precisely demonstrated") (citation and internal quotation marks and brackets omitted)).

Thus, the defendant must explain how the proffered sexual-history evidence would "undercut" the government's case. *Brown, supra*, 840 A.2d at 93. And, where the relevance of the proffered evidence "depends upon the fulfillment of a condition of fact," the defense's burden includes offering sufficient evidence at the *in camera* hearing to support a finding that the pertinent condition is satisfied. D.C.Code § 22–3022(b)(2). This "evidentiary foundational requirement is the bedrock of the protection of victims of sexual assault[,] because it ensures that accounts of a complainant's prior sexual history are not admitted on tenuous or unjustified claims of 'relevance.'" *Scott, supra*, 953 A.2d at 1089.

▮▮▮ If the defense succeeds in crossing the "threshold" relevance hurdle, the trial court must then consider whether the probative value of the past-sexual-behavior evidence outweighs its prejudicial impact. *Scott, supra*, 953 A.2d at 1088 (citing D.C.Code § 22–3022(b)(3)). Prejudicial impact includes intrusion into "the private [sexual] life of a rape victim." *Meaders v.*

*United States*, 519 A.2d 1248, 1254 (D.C. 1986). This court's review of a trial judge's exclusion or limited admission of sexual-history evidence, on the basis of lack of relevance or insufficient probative value, is "highly deferential." *Bryant v. United States*, 859 A.2d 1093, 1104 (D.C. 2004) (noting that we will overturn the court's ruling only "on a showing that the trial court gravely abused its discretion").

We discern no abuse of discretion on the record before us because appellant did not carry his threshold burden of "precisely demonstrat[ing]" the probative value of the evidence he sought to admit. *Brown, supra*, 840 A.2d at 92; *Roundtree v. United States*, 581 A.2d 315, 321 (D.C.1990) ("there is no constitutional right to present irrelevant evidence") (quoting *Gibson v. United States*, 536 A.2d 78, 82 (D.C.1987)); *cf. State v. Wears*, 222 W.Va. 439, 665 S.E.2d 273, 281 (2008) ("A proffer requiring the court to speculate [on the value of sexual history evidence] is insufficient").

The relevance of the past-sexual-behavior evidence that appellant sought to introduce depended upon the fulfillment of at least two obvious conditions of fact (both of which were mentioned during the argument on appellant's motion). First, K.H.'s statement in response to VMHAI form Question 15 (*i.e.*, that she had consensual sex without a condom on November 15) could have supported the defense theory (that appellant was K.H.'s consensual-sex partner on November 15 and left his semen inside her on that day) only if K.H.'s contemporaneous statement in response to VMHAI form Question 20 (*i.e.*, that her November 17 assailant was a "stranger") was untrue.[7] Second, K.H.'s statement

---

**7.** In light of K.H.'s answers to Questions 15 and 20, the most natural reading of her statements on the VMHAI the form is that she had consensual intercourse on November 15 with

someone other than the man who attacked her on November 17, namely appellant Watts. As Judge Retchin reasoned, "[i]t makes no sense to say that the [VMHAI] form somehow

about unprotected consensual sex on November 15 (taken together with the testimony of the government's DNA expert about semen remaining in the vagina for 72 hours and about the absence of any semen other than appellant's on K.H.'s November 17 vaginal swab) could have supported the defense theory that appellant was K.H.'s November 15 partner only if K.H.'s November 15 sexual partner ejaculated inside her vagina.[8]

As to the first condition of fact, appellant went at least part-way[9] in establishing that K.H. was not truthful in stating, in response to VMHAI Question 20, that she did not know her assailant. Defense counsel cite to Judge Retchin a statement by K.H.'s daughter that, prior to the November 17 incident, appellant had "asked [K.H.] for a ride every day." Defense counsel also informed the court that he had "telephone records [and] we'll have testimony that [appellant] called [K.H.], and on at least one occasion spoke to her— for a significant period of time on the telephone when he was out of town."[10] In addition, defense counsel offered to dis-

close to the court *ex parte* (so as not to reveal his trial strategy to the government) more details about the evidence he had described.

As to the second condition of fact, relating to the particulars of the November 15 unprotected "consensual coitus" act that K.H. acknowledged, appellant made no proffer whatsoever. Nor did he request an *in camera* evidentiary hearing. At such a hearing, the defense might have called Nurse Pinn to explain precisely what K.H. stated about her sexual activity on November 15.[11] Defense counsel additionally might have questioned K.H., in the relative privacy of the judge's chambers, about the November 15 consensual sexual act.[12] *See* D.C.Code 22–3022(b)(2) ("At such hearing, the parties may call witnesses, including the alleged victim, and offer relevant evidence"); *see also Scott, supra,* 953 A.2d at 1088 (noting that during *in camera* hearing on appellant's motion to introduce evidence of victim's alleged preference for "rough sex" with her former boyfriend as the cause of the injuries she blamed on sexual assault by appellant, vic-

---

supports your theory that [K.H.] had consensual sex with [appellant] when her only statement was that your client raped her."

8. As the prosecutor argued to Judge Retchin, "there are [sic] an array of reasons why [K.H.'s November 15 partner's] semen isn't inside of her. Maybe he didn't ejaculate in side of her." Stated differently, the point is that if K.H.'s November 15 sexual partner did not ejaculate inside her, the presence of only appellant's semen on K.H.'s November 17 vaginal swab does nothing to negate the government's theory that appellant left his semen during the November 17 assault.

9. We say "part-way" because we are mindful of the government's argument that the defense failed to make the "written offer of proof" required by D.C.Code § 22–3022(b)(2).

10. Defense counsel put on this evidence at trial by eliciting testimony from appellant's sister and admitting into the record documen-

tation of calls made from the sister's cell phone.

11. *Cf. Brown, supra,* 840 A.2d at 93 (defense succeeded in "precise[ly] demonstrat[ing]" the probative value of sexual act evidence where it presented the court with testimony of a witness who saw victim having sex with someone other than the defendant).

12. Defense counsel told the court that he assumed that K.H. would deny any sexual relationship with appellant. However, if defense counsel had sought to question K.H. on this subject *in camera,* the trial judge would have had the opportunity to observe K.H.'s demeanor as part of determining whether to admit the sexual-history evidence that appellant sought to introduce or to allow questioning about it in open court.

tim testified about whether she had sustained injury from consensual sex with the former boyfriend). Or, appellant himself might have testified that he had sex with K.H. on November 15 and ejaculated inside her. *Cf. Bobb v. United States*, 758 A.2d 958, 960 (D.C.2000) (recounting that rape defendant testified at pre-trial hearing that he had had consensual sex with the complainant approximately four or five times); *State v. Atkinson*, 276 Kan. 920, 80 P.3d 1143, 1147, 1150–51 (2003) (where defendant credibly testified that he had engaged in sexual intercourse with victim hours before alleged rape, court should have permitted defendant to cross-examine victim at trial on this possible innocent explanation for why defendant's DNA was found inside of her); *Commonwealth v. Majorana*, 503 Pa. 602, 470 A.2d 80, 85 (1983) (same).[13] Presumably, K.H. and Watts knew better than anyone else whether they had engaged in consensual intercourse on November 15 (and, similarly, K.H. and Pinn had the best information on whether K.H. was or appeared to be telling the truth with respect to some, but not all, of her answers during the VMHAI interview). Far from requesting an opportunity to present testimony of any of these people, defense counsel told the court instead that "there isn't a great deal of specific evidence" of a prior relationship between appellant and K.H.

In short, we agree with the government that appellant failed to meet his threshold burden of laying a factual foundation for the relevance of the statement he sought to have admitted.[14] *Cf. Scott, supra*, 953 A.2d at 1087 (trial court did not abuse its discretion in precluding defense counsel from cross-examining the victim about her "proclivity for 'rough sex,'" where trial judge had indicated willingness to voir dire witnesses or to "accept any other evidence that would lay a foundation for the claim that [the victim's] injuries were not inflicted by appellant but were sustained as a result of ... consensual sex" between the victim and another man, but defense counsel "did not proffer any such evidence or request that [the other man] be called for voir dire"); *Brown, supra*, 840 A.2d at 93 (defendant failed to "proffer any evidence suggesting that this information [relating to victim's sexual history] was credible"); *Roundtree, supra*, 581 A.2d at 321 (where victim's past allegations of sexual assault would be probative "only if they were fabricated," the Confrontation Clause required that defendant be permitted to cross-examine victim about the past allega-

---

**13.** By giving testimony about a prior relationship with K.H. pertinent to the admissibility of the past-sexual-behavior evidence (that appellant sought to introduce to protect his Sixth Amendment right to confrontation), appellant would not have waived his Fifth Amendment privilege not to testify at trial and would not have subjected himself to cross-examination about other issues in the case. *See Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) ("when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection"); *cf.* Fed.R.Evid. 104(e) ("The accused does not, by testifying upon a preliminary matter [such as the admissibility of evidence],

become subject to cross-examination as to other issues in the case").

**14.** We do not suggest that a defendant must address every imaginable counterpoint to his defense theory to clear the relevance hurdle that the Rape Shield Law imposes, but he must present evidence to rebut obvious objections about why the proffered prior-sexual-conduct evidence is not probative. Here, several layers of inference were needed to understand appellant's theory as to why the excluded evidence was relevant, and despite the pertinent witnesses' apparent availability, appellant made no effort to present the testimony that would have most directly supported those inferences.

tions only if defendant had "shown convincingly" through evidence presented to the trial judge that the prior allegations were false). Appellant's proffer fell "short of the standard required to sustain a contention that cross-examination about [K.H.'s statement about unprotected consensual sex on November 15] was constitutionally mandated." *Roundtree, supra,* 581 A.2d at 322; *see also Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) (holding that a defendant's failure to comply with the procedural requirements of a state rape-shield law could require imposition of the severe sanction of preclusion of sexual history evidence). On this record, and given that the intent of the Rape Shield Law is to protect the privacy of a rape victim's past sexual behavior by establishing a high bar to its disclosure in open court, the trial court did not abuse its discretion in denying appellant's motion to introduce K.H.'s statement in response to VMHAI Question 15.[15]

## III.

 Appellant also argues that the trial court violated the rule of completeness when it allowed the government to play a portion of a recording of a telephone call between appellant and Robert Green (who answered the telephone when appellant placed a call, from jail, to potential government witness LaVerne Green), and refused to allow the defense to play the entire recording or specific additional portions of it.[16] During the last two minutes of the portion of the recording that was played for the jury, appellant can be heard saying, "I hope I don't see [Ms. Green] in court. Cause I might be feelin' bad that day and make the whole courtroom famous. . . . I'm an impulsive motherf* *ker. I might just do anything."[17] The court

15. Moreover, we note, Judge Retchin ruled that she would permit the defense to introduce "any other independent evidence" of a consensual relationship between appellant and K.H., and the defense succeeded in putting its theory before the jury in several ways. Defense counsel extensively questioned K.H. about inconsistent statements and elicited testimony suggesting appellant and K.H. spoke or may have spoken to each other on multiple occasions. During closing argument, defense counsel told the jury that K.H.'s testimony that she had no relationship with appellant was "suspect," that the "evidence shows otherwise," and that the physical evidence and the testimony about DNA remaining three to five days meant only that "sometime Mr. Watts had unprotected sex with Ms. K.H." The trial court further permitted counsel to argue that K.H. had fabricated sexual assault charges to hide her ongoing affair with appellant from her boyfriend (thereby avoiding the error at issue in *Olden v. Kentucky,* 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988) (court erred in prohibiting defendant from inquiring into whether complainant had fabricated rape charges to protect her relationship with her boyfriend), a case on which appellant relies). Accordingly, even assuming *ar-*

*guendo* that the trial court erred in excluding K.H.'s statement, we can say with assurance that appellant was not prejudiced by the error. *Cf. Hagins v. United States,* 639 A.2d 612, 617 (D.C.1994) (there was no prejudice warranting reversal where, although trial court barred defense from arguing to the jury that the DNA evidence (which indicated that the victim had had sex with as many as three men) proved prior prostitution and thus consent on the present occasion, the court allowed the defense to argue that the complainant had not adequately explained the DNA evidence by merely recounting having sex with her boyfriend).

16. The "rule of completeness is violated . . . only where admission of [a] statement in its edited form distorts the meaning of the statement or excludes information substantially exculpatory of the declarant." (Rodney) *Brown v. United States,* 934 A.2d 930, 941 (D.C.2007) (citation omitted).

17. During closing argument, the prosecutor characterized this call as one in which appellant "threatened [Green] through her ex-husband . . . so that she wouldn't come to court and testify in [appellant's] trial."

permitted the government to play this portion of the recording as consciousness-of-guilt evidence. Appellant argues that this portion of the recording, heard outside the context of the entire twenty-nine-minute recording, makes him sound unduly "sinister." He contends that, under the rule of completeness, the trial court should have allowed the jury to hear other portions of the conversation that (he argues) reveal him to be "more bark than bite," and a "boastful" but harmless character who cared about Ms. Green and would not actually have hurt her.[18]

By contrast, during the trial court proceedings, defense counsel expressed satisfaction with the trial judge's resolution of this issue. Judge Retchin proposed, in response to the defense's initial rule-of-completeness objection, that she would inform the jury that "this is only a portion of a conversation," and that Ms. Green was appellant's former girlfriend who was not testifying for reasons unrelated to the telephone call. Judge Retchin also agreed to redact from the recording all references to appellant's incarceration pending trial. Defense counsel acquiesced in this compromise solution, stating in response to several of the judge's suggestions, "[y]es, I would like that portion" and "that's fine," and asserting no continuing grievance. In light of defense counsel's failure to preserve an objection, plain-error review is appropriate. See United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993);[19] Reams v. United States, 895 A.2d 914, 920 (D.C.2006) (plain error standard governs where "faulting the judge for [appellant's] own failure to press the issue of admitting those portions [of a statement] would itself be an unfair application of the rule [of completeness]"); Ko v. United States, 722 A.2d 830, 836 (D.C. 1998) (applying the plain error rule where defense counsel acquiesced in the trial court's proposed solution to a "complicated problem").

Appellant's challenge does not survive plain-error review. We are satisfied that the trial court's ruling did not affect his "substantial rights," Johnson, supra note 19, 520 U.S. at 467, 117 S.Ct. 1544 because the portion of the telephone call that was played added little to the government's case. First, Judge Retchin instructed the jury that the recording was being admitted for the limited purpose of showing consciousness of guilt, and "we must presume that a jury follows the court's instructions, absent any indication to the contrary." Lewis v. United States, 930 A.2d 1003, 1008 (D.C.2007). Second, as consciousness-of-guilt evidence, the recording played for the jury was duplicative of the unimpeached testimony of government witness Ronnie Cummings that appellant admitted, just after the November 17 incident, that he "did it" and "want[ed] to kill [him]self" because he was going to jail for the rest of his life. Third, having listened to the entire recording, we think it paints a picture of appellant as a violent individual, and, for appellant's purposes, was better

---

18. Defense counsel sought to admit, *inter alia,* a portion of the telephone conversation in which appellant stated, "I started trial today ... and found out today that [Ms. Green is] one of the witness that'll be coming to testify on me and I really wanna know why would she try to hurt me like that.... I never stopped loving her or her son.... Just ask her why she's testifying on me."

19. To succeed under the plain error standard of review, an appellant must show (1) error (2) that is "plain" (3) that affects his substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *See Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

left unplayed.[20] Thus, even if we assume *arguendo* that the trial judge erred in admitting only two minutes of the recording, we do not see "a reasonable probability [that such error] had a prejudicial effect on the outcome of [appellant's] trial." *Thomas v. District of Columbia,* 942 A.2d 645, 650 (D.C.2008).

### IV.

Appellant's final claim of error is that his convictions for first-degree and third-degree sexual abuse should merge. The government does not oppose merger. Accordingly, we remand to the trial court for the purpose of vacating the conviction for third-degree sexual abuse.[21] In all other respects, the judgments of conviction are

*Affirmed.*

**20.** For example, during the telephone call, appellant describes instances in which he was "aggressive with" Ms. Green and "put [his] hands on her" and "threatened her." He admitted to having a "very violent, vicious background" and stated, at one point, "the less people testifying, the better my chances are...."

**21.** *See Mooney v. United States,* 938 A.2d 710, 724 (D.C.2007) ("when resentencing to respect the double jeopardy bar on multiple punishments for the same offense where the defendant has been convicted of a greater and lesser-included offense, the trial court has but one course, to vacate the lesser-included offense").