### Manuel M. BROWN, Appellant,

v.

### UNITED STATES, Appellee.

#### No. 02–CF–1313.

District of Columbia Court of Appeals.

Argued Jan. 28, 2009.

Decided Aug. 27, 2009.

Patrick T. Hand, Washington, DC, appointed by the court, for appellant.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Jeffrey Taylor, United States Attorney at the time the brief was filed, and Roy W. McLeese III, Thomas J. Tourish, Jr., and Alan Boyd, Assistant United States Attorneys, were on the brief, for appellee.

James Klein, Alice Wang, and Chris Kemmitt, Public Defender Service, filed a brief as amicus curiae.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and BELSON, Senior Judge.

THOMPSON, Associate Judge:

Appellant Manuel Brown challenges his conviction for first-degree murder while armed (D.C.Code §§ 22–2101, –4502(a) (1999 Supp.)); possession of a firearm during a crime of violence ("PFCV") (D.C.Code § 22–4504(b) (1999 Supp.)); and carrying a pistol without a license ("CPWL") (D.C.Code § 22–4504(a)(1) (1999 Supp.)). He contends that the trial court erred in failing to suppress a videotaped statement that he gave to police, and that the evidence was insufficient to sustain his CPWL conviction and likewise insufficient to prove that he committed murder "while armed with a pistol," as charged in the indictment. He also argues

that the trial court erred by failing to instruct the jury on the definition of a "pistol." Supported by *amicus curiae* PDS, appellant contends in addition that his CPWL conviction must be reversed as a violation of the Second Amendment to the U.S. Constitution. We reject each of these arguments and affirm the judgments of conviction.

## I.

The pertinent evidence at trial was presented largely through two videotaped statements that appellant gave to police and through appellant's own testimony. On January 21, 1999, appellant, who was 17 years old at the time, was with friends in the area of Seventh and O Streets, N.W., when Andre Hawkins, another friend, approached the group. Hawkins said, "I stay strapped" (apparently meaning that he was armed) and then lifted up his shirt and showed the group a gun. Appellant recognized the gun as a "Colt .45 pistol." Saying that he did not want to "keep [the gun] on him," Hawkins stashed it in a brown paper bag amid some nearby bushes. A while later, appellant retrieved the gun and put it in his waistband, prompting Hawkins to ask appellant why he was trying to steal the gun. Appellant denied trying to steal the gun and returned it to Hawkins.

Shortly afterward, Hawkins learned that he had no place to stay that night, and appellant invited Hawkins to stay with him at his mother's apartment on Martin Luther King Avenue. After appellant and Hawkins went there, appellant introduced Hawkins to Lawrence Hill, who lived in an apartment in the same building. The three spent the remainder of the day drinking cognac and smoking marijuana together. Hawkins repeatedly told Hill that he (Hawkins) should have killed appellant for trying to steal his gun. Hill,

who was "scared," conveyed this information to appellant. Noticing that Hawkins kept trying to reach into his pocket, appellant at one point "started running" because "I didn't want [Hawkins] to shoot me."

When appellant and Hawkins were alone a while later in the day, appellant, thinking he needed to vomit, stepped outside to the parking lot. Hawkins followed appellant, and once again complained that appellant had tried to steal his gun. Hawkins then pulled out the gun and pointed it at appellant's face. Appellant grabbed the gun and the two wrestled for it. In the videotaped statement that appellant gave to police on February 24, 1999, he explained that as he and Hawkins were wrestling for the gun, appellant got the gun, shot Hawkins, and then ran back into the apartment building. After a while, appellant looked outside and saw that Hawkins's body was gone. Appellant then saw Hawkins at the side of the building and heard Hawkins make a noise that sounded like gasping for air. "Scared" that Hawkins "was going to come back," appellant locked the door, sat for a moment, and then went outside. Finding Hawkins still alive, appellant shot Hawkins a second time and then went back inside. Appellant stated that he shot Hawkins "on self-defense."

Testifying at trial, appellant gave the jury a different account. He testified that as he and Hawkins were wrestling for the gun, the gun discharged, firing into Hawkins's face. Appellant then picked up the gun, because he "didn't want to leave [it] there so [Hawkins] could shoot me in my back," and ran. As he was running, he heard something behind him and turned to see Hawkins charging at him with a black object that appellant thought was a gun. Appellant testified that Hawkins was known to carry two guns and that "I thought he was about to kill me . . . so I shot one time." Appellant testified that he

later gave the gun to one of his friends and told him to throw it away or sell it.

Medical Examiner Gertrude Juste–Hjardemaal testified that the first bullet hit Hawkins in the face, but that Hawkins could have survived the injury it inflicted. The second bullet, however, penetrated the top of Hawkins's skull, inflicting the fatal injury.

## II.

Appellant's first argument on appeal is that the February 24 videotaped statement should have been suppressed because it was obtained following an unreasonable delay in presentment, in violation of Rule 5(a) of the Superior Court Rules of Criminal Procedure. *See* Super. Ct.Crim. R. 5(a) (providing that a police officer "shall take the arrested person without unnecessary delay before the court").[1] The background of this argument is as follows.

Metropolitan Police Department Detective Pamela Reed was assigned to investigate the homicide. After an informant provided information that appellant was involved in the shooting, Detective Reed learned that there was an outstanding custody order (an "absconder warrant") for appellant's detention. Detective Reed asked a fellow officer to look for appellant, and that officer took him into custody on the absconder warrant on February 10, 1999. On the same day, Detective Reed questioned appellant after she had read to him, and he had waived in writing, his *Miranda*[2] rights. During the February 10 interview, which was videotaped, appellant told Detective Reed that Hawkins had accused him of trying to steal Hawkins's gun, that Hawkins later pulled the gun on appellant, that the two wrestled, and that the gun discharged, shooting Hawkins in the head. During the taping, appellant did not mention shooting Hawkins a second time.

After the February 10 interview, appellant remained in custody on the absconder warrant. Although believing that she had probable cause to arrest appellant in connection with the shooting of Hawkins, Detective Reed did not immediately seek an arrest warrant in this matter. However, after speaking with the medical examiner's office and learning that Hawkins was alive between the first shot and a second shot, Detective Reed obtained a warrant for appellant's arrest on the murder charge on February 22, 1999, and obtained a "comeup" order (*i.e.,* an order that appellant be brought from the jail) on February 24. Officer Reed took custody of appellant and, after again reading appellant his *Miranda* rights and obtaining his written waiver on a PD–47 form, conducted a sec-

1. *See also* D.C.Code § 23–562(c)(1) (2001) ("A law enforcement officer within the District of Columbia ... shall take the arrested person without unnecessary delay before the court or other judicial officer empowered to commit persons charged with the offense for which the arrest was made.... This subsection, however, shall not be construed to conflict with or otherwise supersede section 3501 of Title 18, United States Code."); 18 U.S.C. § 3501(c) ("In any criminal prosecution by the United States ..., a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate [magistrate judge] or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention....").

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ond videotaped interview (lasting about 15 minutes). As already described, in the February 24 interview, appellant stated that he shot Hawkins again after finding that Hawkins was still alive and had moved close to the apartment building after sustaining the first gunshot wound. On February 25, 1999, the following day, appellant was presented in court on the homicide charge.

Appellant filed a pre-trial motion to suppress the February 24 videotape on the grounds that his statements were obtained in violation of his Fourth and Fifth Amendment rights. The trial court denied the motion (and in this appeal appellant has not challenged admission of the videotape on those grounds).[3] Appellant did not argue in the trial court that his February 24 statement should be suppressed because of a presentment delay. Accordingly, as appellant acknowledges, his delayed presentment claim is subject to plain-error review.[4]

 Appellant's claim does not withstand plain-error review. The rule that makes a statement obtained from a defendant during a delay in presentment subject to exclusion is a "supervisory" rather than a constitutional principle, *Corley v. United States*, —— U.S. ——, ——, 129 S.Ct. 1558, 1562, 173 L.Ed.2d 443, 450 (2009), that "aims to avoid all the evil implications of secret interrogation of persons accused of crime."[5] *McNabb v. United States*, 318 U.S. 332, 344, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *see also Mallory v. United States*, 354 U.S. 449, 454, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) (explaining that under Fed. R.Crim.P. 5(a), which requires arraignment before a judicial officer as quickly as possible so that an arrested person may be advised of his rights, the arrestee "is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself ... to eliciting damaging statements to support the arrest and ultimately his guilt"). However, this court has consistently held that "the prohibition against unnecessary delay reflected in the*Mallory/McNabb* doctrine, and in [Rule] 5(a), may be waived," *Outlaw v. United States*, 806 A.2d 1192, 1200 (D.C.2002), and that "a valid waiver by an accused of his *Miranda* rights[6] is also a waiver of his right ... to presentment without unnecessary delay," *Crawford v. United States*, 932 A.2d 1147, 1157 (D.C.2007), which waiver "is valid even if obtained during the period of un-

---

**3.** Appellant has also abandoned his argument (raised in his initial brief in this court but withdrawn in his reply brief) that his statements were obtained in violation of his Sixth Amendment rights.

**4.** *See United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (where no objection was specifically and timely articulated in the trial court, relief on appeal may be had only for (1) error that (2) is plain, that (3) affects substantial rights and that (4) seriously affects the fairness, integrity or public reputation of judicial proceedings).

**5.** The Fourth Amendment to the U.S. Constitution has also been interpreted to require that an arrestee be brought promptly before a judicial officer, but the Supreme Court has

"never held that this constitutional requirement is backed by an automatic exclusionary sanction." *Corley, supra,* 129 S.Ct. at 1574 (Alito, J., dissenting) (citing *County of Riverside v. McLaughlin,* 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), and *Hudson v. Michigan,* 547 U.S. 586, 592, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006)).

**6.** Appellant does not argue that his waiver of his *Miranda* rights was involuntary or otherwise invalid. The trial court found that there was "no evidence of any problem regarding voluntariness" of appellant's waiver of "his rights under *Miranda*," and, having viewed the February 24 videotape, we noticed nothing that gives us reason to think that appellant's waiver and statements were other than voluntary.

necessary delay." [7] *Outlaw*, 806 A.2d at 1200 (citation omitted).[8] Thus, under the precedents of this court, when Detective Reed read appellant his *Miranda* rights and appellant signed the PD–47 card waiving those rights prior to the detective interviewing him on February 24, appellant also waived his right to presentment without unnecessary delay. Accordingly, the trial court did not err, let alone plainly err, in failing to suppress the statements that appellant made on the February 24 videotape.[9]

A final point in light of the Supreme Court's recent opinion in *Corley, supra,* — U.S. ——, 129 S.Ct. 1558, 173 L.Ed.2d 443: the Court held that 18 U.S.C § 3501(c), discussed in note 1 *supra,* modified (but did not supplant) the prompt presentment rule established by *McNabb* and *Mallory, supra,* with the result that, generally, "a district court with a suppression claim must find whether the defendant confessed within six hours of arrest. . . . If the confession came within that period, it is admissible, subject to the other Rules of Evidence, so long as it was 'made voluntarily and . . . the weight to be given [it] is left to the jury.'" *Corley,* 129 S.Ct. at 1571. Because the Third Circuit had not considered whether Corley's oral confession should be treated as having been made within six hours of arrest, the Supreme Court remanded the case for consideration of that issue. *Id.* Notably, the Supreme Court reached its decision to remand notwithstanding the fact that Corley confessed only after (twice) signing a form waiving his *Miranda* rights. *See id.* at 1565, 1571. However, the Court in *Corley*

7. The discussion in *Corley, supra,* elucidates why a waiver of *Miranda* rights has been held to waive the right to prompt presentment. The Court explained that without the prompt presentment rule, law enforcement agents "would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to." *Corley,* 129 S.Ct. at 1570. The requirement of prompt presentment before a judicial officer, which "stretches back to the common law," was one of the most important procedural safeguards to prevent the false confessions that prolonged custodial police interrogation might induce. *Id.* It "ensured that persons taken into custody would, within a relatively short period, receive advice about their rights." 129 S.Ct. at 1574 (Alito, J. dissenting). However, with *Miranda* "ensur[ing] that arrestees receive such advice at an even earlier point, within moments of being taken into custody," the right to prompt presentment is just one in a package of rights that may be waived when a person is subjected to custodial interrogation. *Id.* As Justice Alito observed, "it seems unlikely that many arrestees who are willing to waive the right to remain silent and the right to the assistance of counsel during questioning would balk at waiving the right to prompt presentment." *Id.*

8. *See also In re T.H.,* 905 A.2d 195, 200 (D.C. 2006) ("With respect to both juveniles and adults, we repeatedly have held that a waiver of *Miranda* rights also constitutes a waiver of the right to prompt presentment."); *but see Everetts v. United States,* 627 A.2d 981, 985 (D.C.1993) (cautioning, in a case involving a delay in presentment of a 16–year–old boy who was kept handcuffed to a desk for up to eight hours during that delay, that "reliance on a *Miranda* waiver becomes weaker as the length of pre-presentment detention grows[,] necessarily impl[ying] that at some point unjustified delay in presentment may trump all other factors in the ultimate voluntariness determination").

9. Without citation to authority, appellant argues that the relevant delay was not the delay between appellant's arrest for murder on February 24 and his presentment on that charge on February 25, but instead the delay between February 10 (when appellant was arrested on the custody order and the first videotaped interview gave Detective Reed probable cause to arrest appellant) and the presentment on February 25. Even if we were to accept that argument, appellant's waiver of his *Miranda* rights before giving his February 24 statement was nonetheless a waiver of the presentment delay.

did not specifically consider whether a waiver of *Miranda* rights may constitute a waiver of the right to prompt presentment. *See Corley*, 129 S.Ct. at 1574–75 (Alito, J., dissenting) (noting that "more than a few courts of appeals have gone as far as to hold that a waiver of *Miranda* rights constitutes a waiver under *McNabb–Mallory*," and observing that "[w]hether or not those decisions are correct, it is certainly not clear that the *McNabb–Mallory* rule adds much protection beyond that provided by *Miranda*"). We therefore do not read *Corley* as effectively overruling our precedents holding that a waiver of *Miranda* rights is a waiver of the right to prompt presentment.[10] Rather, the issue is one that "merely lurk[s] in the [*Corley*] record, ... [not] ruled upon, [and] ... not to be considered as having been so decided as to constitute precedent[ ]," since the "judicial mind was not asked to focus upon, and the opinion did not address, the point at issue...." *Threatt v. Winston*, 907 A.2d 780, 790 n. 17 (D.C.2006) (citation and internal quotation marks omitted).

### III.

▪ To be convicted of CPWL, a defendant must have carried a "pistol." *See* D.C.Code § 22–4504(a). A "pistol" is defined as "any firearm with a barrel less than 12 inches in length." D.C.Code § 22–4501(a) (1999 Supp.) Appellant argues that the evidence was insufficient to show that

he carried or was armed with a pistol, because no evidence was presented about the length of the barrel of the gun involved in the events of January 21, 1999. On the same ground, he argues that the government failed to prove that he killed Hawkins "while armed with a pistol."

Appellant is correct that the government provided no evidence about the actual barrel length of the gun (the gun never having been recovered by police). However, both the government and the defense presented evidence from which the jury could reasonably find that the gun was a pistol. Appellant, who testified to having held guns for "older dudes" on more than one occasion and who described the cocking mechanism of Hawkins's gun in detail (answering one of the prosecutor's questions by saying that his description was just "like the [government's firearms] expert was telling you"), repeatedly referred to the firearm as a pistol and specifically testified that the gun was a Colt .45 pistol.[11] Appellant further testified that he and Hawkins each had carried the gun in their waistbands, and that Hawkins stashed the gun in a paper bag. Appellant also testified that, as Hawkins reached into his pocket, appellant was concerned that Hawkins would shoot him—thus implying that the gun was in, and was small enough to fit inside, Hawkins's pocket. In addition, Hill testified that he saw appellant carrying the gun in his pocket after returning from the

---

10. And, in any event, appellant does not contend that his February 24 statement was elicited more than six hours after he was arrested on the murder charge. *See* D.C.Code § 23–562(c)(1) (2001) (which by its terms "shall not be construed to conflict with or otherwise supersede [18 U.S.C. § 3501(c)]").

11. Appellant's testimony on this point was corroborated by the government's evidence about the .45 caliber of the shell casings recovered at the crime scene. The firearms examiner testified that a Colt .45 has a barrel

length of less than twelve inches. While he acknowledged that a .45–caliber bullet could fire from a gun with a barrel longer than 12 inches, he also testified that .45 rifles are rare—there are "not too many of them out there." Furthermore, the firearms expert described the Colt .45 as possessing a single-action cocking mechanism, apparently an atypical feature. This unusual characteristic matched the description independently offered by appellant regarding the weapon he used on the day of the murder.

parking lot. Viewing the evidence in the light most favorable to the government, as we are required to do in evaluating a sufficiency claim,[12] we are satisfied that there was ample evidence from which the jury could infer that the gun was a pistol.

 Appellant also argues that the trial judge erred by failing to provide jurors with an instruction defining the term "pistol" with regard to barrel length. We review this claim for plain error, as appellant did not request such an instruction. *See Curington v. United States*, 621 A.2d 819, 821 (D.C.1993) ("Notwithstanding the absolute language of [Super. Ct.Crim.] Rule 30, . . . this court may review whether the trial court erred by failing to instruct the jury on the statutory definition of pistol, but the scope of our review must be in accordance with the extremely limited plain error standard"). The error that appellant alleges is hardly "plain," because "[t]he statutory definition of the term 'pistol,' . . . is just that—a definition of a term included in one of the elements. It is not an element of the statutory offense that the trial court [is] required to specifically include as part of the jury instructions." *Curington, supra*, 621 A.2d at 823. Moreover, where no instructional objection was raised at trial, an instructional error will not warrant reversal if "no rational jury, shown by its verdict to have found the facts necessary to convict the defendant under the instructions as given, could have failed, if fully instructed on each element, to have found in addition the facts necessary to comprise the omitted element." *White v. United States*, 613 A.2d 869, 879 (D.C.1992). That is the case here. In

light of the evidence discussed above, rational jurors could not have failed to find that the gun the jury convicted appellant of carrying had a barrel length of less than twelve inches. Thus, even assuming *arguendo* that there was instructional error, "we find no miscarriage of justice that would warrant reversal of . . . appellant's convictions." *Curington, supra*, 621 A.2d at 821–22.

### IV.

Appellant's final claim, which he preserved through a pre-trial motion to dismiss, is that his CPWL conviction cannot stand because the CPWL statute is "invalid upon its face" and because the conviction rests upon conduct that is "constitutionally protected." We reject both arguments.

In advancing these arguments, appellant and *amicus* rely heavily on *District of Columbia v. Heller*, 554 U.S. ——, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), in which the Supreme Court held that the Second Amendment confers an individual right to keep and bear arms and prohibits the District of Columbia from maintaining what amounted to an absolute ban on handgun ownership by ordinary citizens. *Id.* at 2817–18.[13] *Heller* did not, however, invalidate any of the District's individual gun control laws, *see Howerton v. United States*, 964 A.2d 1282, 1288 (D.C.2009) ("Notably, the Supreme Court in *Heller* did not declare invalid any of the individual statutes under which appellant Howerton was convicted [including D.C.Code Section

---

12. *See Scott v. United States*, 953 A.2d 1082, 1095 (D.C.2008).

13. As *amicus* notes, at the time of appellant's offense, licenses could be obtained only for a registered pistol, 24 DCMR § 24–2304.15, and the registration of pistols by ordinary

citizens was prohibited by D.C.Code § 7–2502.02(a)(4). Accordingly, it was impossible for an ordinary citizen to carry a pistol lawfully, a total ban that the *Heller* Court held violated the Second Amendment. 128 S.Ct. at 2817–18.

22–4504(a)]").[14] In addition, the Supreme Court specifically directed the District to license Mr. Heller to carry a gun in his home if he met other regulatory requirements. *See* 128 S.Ct. at 2822. Thus, in *Heller*, the Court neither held nor implied that a law requiring a license to carry a pistol on its face violates the Second Amendment.

The CPWL statute in issue here, D.C.Code § 22–4504(a), states that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law...." Thus, the statute prohibits carrying a pistol without a license (and, contrary to *amicus's* statement, appellant was not "convicted of CPWL for simply possessing and carrying a pistol" but was convicted of carrying a pistol *without a license*). Appellant's and *amicus's* argument that the CPWL statute is facially invalid amounts to an argument that "no application of the [CPWL] statute could be constitutional." *Sabri v. United States,* 541 U.S. 600, 609, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004). However, the Su-

preme Court has "recognized the validity of [such] facial attacks ... in relatively few settings," *id.,* and even then, "generally, on the strength of specific reasons weighty enough to overcome [the Court's] well-founded reticence." *Id.* at 609–10, 124 S.Ct. 1941.[15] We are not persuaded that "no application of the [CPWL] statute could be constitutional" or that the restriction the CPWL statute imposes comes even close to presenting the kind of "weighty" reason that the Supreme Court has concluded justifies declaring a statute invalid on its face.

■ On its face, the licensure requirement that the CPWL statute imposes does not appear as a substantial obstacle to the exercise of Second Amendment rights. Moreover, while the statute indisputably imposes a regulatory restriction on the right to bear arms, on its face it does not stifle a fundamental liberty. *See United States v. Miller,* 604 F.Supp.2d 1162, 1170 (W.D.Tenn.2009) ("a close examination of *Heller* reveals that the Court never explicitly embraced ... the right to bear arms as 'fundamental' under the Constitution").[16] For these reasons, we conclude

---

14. And, although the District has amended many of its gun control provisions in the wake of *Heller*, it has not amended D.C.Code § 22–4504(a), the statute under which appellant was convicted.

15. *See Sabri, supra,* 541 U.S. at 610, 124 S.Ct. 1941 (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (explaining that facial overbreadth challenges are entertained in the First Amendment context because "it has been the judgment of this Court that the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes"); *Aptheker v. Secretary of State,* 378 U.S. 500, 508, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (invalidating law that prohibited any person who was a mem-

ber of a Communist organization from applying for or using a passport, thereby "broadly stifl[ing] [the] fundamental personal libert[y]" of freedom to travel); *City of Boerne v. Flores,* 521 U.S. 507, 532, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (invalidating statute whose "sweeping coverage ensures its intrusion at every level of government" and thus "contradicts vital principles necessary to maintain separation of powers and the federal balance"); *Stenberg v. Carhart,* 530 U.S. 914, 921, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (invalidating law that imposed an "undue burden" on and a "substantial obstacle" in the path of a woman seeking an abortion of a nonviable fetus)).

16. The court in *Miller* explained that:

At the only portion of his [*Heller*] opinion in which fundamental rights were mentioned, Justice Scalia noted the following: By the

that the CPWL statute is not invalid on its face.[17]

We turn next to amicus's "as applied" argument: the argument that enforcement against appellant of the CPWL statute—as part of the District's regulatory scheme that required him to have a license to carry a pistol but made it impossible for him to obtain such a license—violated his rights under the Second Amendment. We begin this analysis by acknowledging, as *amicus* emphasizes, that in *Heller,* while declaring "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," 128 S.Ct. at 2821, the Supreme Court did not "undertake an exhaustive . . . analysis of the full scope of the Second Amendment." *Id.* at 2816. Thus, even though the evidence does not support a claim that appellant carried a gun "in defense of hearth and home," that fact alone does not necessarily mean that appellant's conduct was without constitutional protection.

In analyzing whether enforcement of the CPWL statute against appellant impermissibly infringed his rights under the Second Amendment, our initial task is to ask what level of scrutiny we must apply in considering appellant's claim. In *Heller,* the Supreme Court "did not explicitly designate a level of scrutiny for evaluating Second Amendment restrictions." *United States v. Miller,* 604 F.Supp.2d 1162, 1170 (W.D.Tenn.2009) (citing *Heller,* 128 S.Ct. at 2821 (acknowledging dissenting Justice Breyer's criticism of the *Heller* majority for not establishing a level of scrutiny)); *see also United States v. Booker,* 570 F.Supp.2d 161, 163 (D.Me.2008) (observing that *Heller* "consciously left the appropriate level of scrutiny for another day"). The Court did, however, reject a rational-basis test, explaining that it "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, . . . [such as] the right to keep and bear arms." *Heller,* 128 S.Ct. at 2818 n. 27. Courts that have considered the issue have reasoned that strict scrutiny also is not appropriate because "the Court never explicitly embraced or rejected the right to bear arms as 'fundamental' under

time of the founding, the right to have arms had become fundamental for English subjects. . . . *Heller,* 128 S.Ct. at 2798. As should be clear from the overall opinion, Justice Scalia's references to Blackstone and the law of England was [sic] meant to show the historical context in which the Second Amendment was drafted. It was not a definitive statement that the right to bear arms is "fundamental," as that term of art has been used in American constitutional jurisprudence. *See United States v. Darrington,* 351 F.3d 632, 635 (5th Cir.2003) (stating that the judicial intent to classify an individual right as a "fundamental right" should be conveyed by explicit use of that precise constitutional term of art). Merely because gun ownership carried significance among English subjects in the Eighteenth Century does not automatically compel the conclusion that the right to bear arms is "fundamental to the American scheme of

justice." *Benton v. Maryland,* 395 U.S. 784, 795, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). *Miller,* 604 F.Supp.2d at 1171 n. 10; *see also United States v. Radencich,* No. 3:08–CR–00048(01)RM, 2009 U.S. Dist. Lexis 3692, *12–13 (N.D.Ind. Jan. 20, 2009) (observing that the *Heller* Court "didn't find that the individual right to bear arms is a fundamental right"); *United States v. Schultz,* No. 1:08–CR–75–T5, 2009 U.S. Dist. Lexis 234, *14–15 (N.D.Ind. Jan. 5, 2009) ("the Supreme Court did not state that there is a fundamental right to keep and bear arms").

**17.** As we noted in *Howerton,* "the fact that an act 'might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.' " 964 A.2d at 1288 n. 10 (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).

the Constitution." *Miller,* 604 F.Supp.2d at 1170; *Schultz, supra* note 16, 2009 U.S. Dist. Lexis 234 at *14–15 ("because the Supreme Court did not state that there is a fundamental right to keep and bear arms, strict scrutiny does not apply"). Rather, some courts have concluded, intermediate scrutiny is the appropriate standard.[18] To withstand intermediate scrutiny, a governmental restriction "must be substantially related to an important governmental objective." *Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988).

Other courts have emphasized that, rather than actually announce a standard of review applicable to Second Amendment claims, the *Heller* Court "evaluated the regulation at issue against the kind of conduct the Second Amendment protected from infringement." *Nordyke v. King,* 563 F.3d 439, 458 (9th Cir.2009); *see also Booker, supra,* 570 F.Supp.2d at 163. Those courts have focused on the Supreme Court's statement in *Heller* that "nothing in [the *Heller* ] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," *Heller, supra,* 128 S.Ct. at 2816–17; and

on the Court's express caution that it did not intend this list of "presumptively lawful regulatory measures" to be exhaustive. *Id.* at 2817 n. 26. Accordingly, some courts have concluded, a "useful approach" is to ask whether a statutory prohibition in issue is "similar enough" to the Supreme Court's "list of 'longstanding prohibitions' that survive Second Amendment scrutiny" that the restriction should be allowed to stand. *Booker, supra,* 570 F.Supp.2d at 163.

■ Under either approach—intermediate scrutiny or a consideration of whether the restriction is "similar enough ... to justify its inclusion in the list of 'longstanding prohibitions' that survive Second Amendment scrutiny"—we have little trouble concluding that the enforcement of the CPWL statute involved here was lawful. *Id.* For even if, as *amicus* argues, "[t]he firearm registration and licensing statutes under which [appellant] was prosecuted amount to an unconstitutional ban on the carrying of pistols by *ordinary* citizens," appellant was hardly an ordinary citizen on January 21, 1999 (italics added). Appellant was an adjudicated delinquent, was serving what amounted to a sentence in a juvenile detention facility, had absconded from the facility, and was the subject of a custody order (and, as his counsel acknowledged at his disposition hearing, had "a

---

18. *See Miller,* 604 F.Supp.2d at 1171; *Radencich, supra* note 16, 2009 U.S. Dist. Lexis 3692 at *12–13 (agreeing that the constitutionality of a gun-possession restriction "should be reviewed under intermediate scrutiny"); *Schultz, supra* note 16, 2009 U.S. Dist. Lexis 234 at *14–15 ("[S]trict scrutiny does not apply. That leaves intermediate scrutiny."); *United States v. Moore,* No. 3:09cr18, 2009 U.S. Dist. Lexis 32953, *9 (W.D.N.C. Apr. 17, 2009) ("the Court joins the majority of courts which have addressed this issue and concludes that [a gun-possession restriction] is most appropriately subject to intermediate scrutiny"); *United States v. Marzzarella,* 595

F.Supp.2d 596, 604 (W.D.Pa.2009) (observing that the Supreme Court's "willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review") (citing 128 S.Ct. at 2851 (Breyer, J., dissenting) (noting that the majority "broadly approv[ed] a set of laws—prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales— whose constitutionality under a strict scrutiny standard would be far from clear")).

severe drug and alcohol problem" at the time of his offense). Prohibiting an adjudicated delinquent still under sentence for his offenses from obtaining a license to carry a pistol, and punishing him for carrying a pistol without a license, serve an important governmental objective and, in our view, fit easily within the list of prohibitions that survive Second Amendment scrutiny. In short, that District law did not afford appellant license to carry a pistol on January 21, 1999, did not infringe appellant's rights under the Second Amendment.

■ In light of our analysis above, we need not venture much further into the many arguments that the parties have advanced regarding appellant's Second Amendment claim (including, for example, their arguments about whether the Second Amendment generally affords a seventeen-year-old a right to bear arms); we leave analysis of those arguments for another day. But one other point does warrant discussion. During his testimony at trial, appellant claimed that when he wrestled the gun away from Hawkins and later shot him fatally, he acted out of fear for his life and in self-defense. Of course, in convicting appellant of murder, the jury necessarily rejected his claim that, in delivering the fatal shot, he acted in self-defense. Nevertheless, we can assume that although appellant could not have obtained a license to carry the gun, he did exercise his Second Amendment and self-defense rights when he carried the gun away from the parking lot (to keep Hawkins from recovering the gun and shooting appellant in the back) and when he returned to the parking lot to see whether Hawkins remained a threat. *Cf. Heller*, 128 S.Ct. at 2846 (Stevens, J., dissenting) (recognizing the "reality that the need to defend oneself may suddenly arise in a host of locations outside the home").[19] However, the foregoing were not the only times on the day in question when appellant carried Hawkins's pistol without a license. The evidence at trial included appellant's admission that, while in the area of Seventh & O Streets with Hawkins and others, appellant retrieved Hawkins's pistol and put it in his own waistband. Appellant explained that he was "holding it for him [Hawkins] until he come back."[20] Importantly, appellant did not testify, and he does not argue, that he was holding Hawkins's pistol for self-defense reasons at that time. We perceive no impediment to sustaining appellant's CPWL conviction, because appellant's carrying of Hawkins's pistol at Seventh & O Streets was not constitutionally protected as an instance of bearing arms for self-defense.

For the foregoing reasons, the judgments of conviction are

*Affirmed.*

19. *But see Brown v. United States*, 619 A.2d 1180, 1182 (D.C.1992) ("A defendant cannot successfully claim self-defense when 'he left an apparently safe haven to arm himself and return to the scene'") (quoting *Rowe v. United States*, 125 U.S.App.D.C. 218, 370 F.2d 240, 241 (D.C.Cir.1966) (per curiam)).

20. Appellant also explained that he had the gun on him while at Seventh & O Streets because "I was holding it because I was so young. I looked young and I was young at that time, the police ain't mess with me.... I was just putting it on because they [the police] always jump out. That's what the older dudes would tell me to put it on, hold it for them."