Marvin C. LITTLE, Appellant,

v.

UNITED STATES, Appellee.

No. 06–CF–140.

District of Columbia Court of Appeals.

Argued Feb. 18, 2009.

Decided Feb. 25, 2010.

Jonathan P. Willmott, for appellant.

Roy W. McLeese III, Assistant United States Attorney, with whom Jeffery A. Taylor, United States Attorney at the time the brief was filed, and Elizabeth Trosman, John P. Gidez and Michael C. Liebman, Assistant United States Attorneys, were on the brief, for appellee.

Alice Wang, Public Defender Service, with whom James Klein, Samia Fam, Jaclyn Frankfurt, and Chris Kemmitt, Public Defender Service, filed a brief as amicus curiae for appellant.

Before REID, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

BLACKBURNE–RIGSBY, Associate Judge:

As a result of his involvement in a violent attempt to rob a purported drug dealer, appellant Marvin Little was convicted by a jury of one count of armed robbery ("AR"), two counts of assault with a dangerous weapon ("ADW"), two counts of aggravated assault while armed ("AAWA"), three counts of possession of a firearm during a crime of violence ("PFCV"), one count of carrying a pistol without a license ("CPWL"), one count of possession of an unregistered firearm ("UF"), and one count of unlawful posses-

sion of ammunition ("UA").[1] Appellant raises three issues on appeal. First, appellant claims that his CPWL, UF, and UA convictions should be reversed because the relevant statutes violate his Second Amendment rights. Second, appellant asserts that the trial court gave an erroneous aiding and abetting instruction to the jury. Third, appellant contends that the trial court erred in admitting a "certificate of no record" of firearms registration and a "certificate of no record" of a license to carry a pistol because their admission violated his rights under the Sixth Amendment Confrontation Clause. We affirm all of appellant's convictions.

## I.

On the evening of February 4, 2004, Michael Richardson, a purported marijuana dealer, received a call at home from his friend, Slavko Totev, who told Mr. Richardson that he would be stopping by for a visit. Shortly after the call, four men, including appellant, entered Mr. Richardson's apartment without invitation. Two of the men pulled out guns, ordered Mr. Richardson to lie on the floor and demanded money. When Mr. Richardson said he did not have any money, the men proceeded to search his apartment. Approximately ten minutes after the four men had arrived, Mr. Totev arrived and one of the four assailants let him into the apartment. When Mr. Totev entered the apartment, he saw several men standing in the middle of the room and Mr. Richardson lying on the floor. He then felt a gun at the back

of his head and was ordered to lie on the floor.

Appellant searched Mr. Totev for money while he was lying on the floor, and then tied his hands behind his back. Appellant took Mr. Totev's wallet, cell phone, and car keys, and then covered Mr. Totev's head with blankets and pillows. After a few more minutes of demanding money from Mr. Richardson and searching the apartment, appellant lifted Mr. Totev from the floor and placed a knife to his throat. Appellant told Mr. Richardson that he would cut Mr. Totev's throat unless Mr. Richardson gave him the money. Mr. Richardson did not respond and appellant cut Mr. Totev's throat.[2] Appellant let Mr. Totev fall to the floor, and discussed with the other intruders how to proceed. Two of the intruders left while appellant and the other assailant stayed in the apartment. Mr. Richardson then informed the men that there was some money in the corner.

While appellant and the other assailant were searching, Mr. Richardson was able to free his hands. He rushed the men and slammed them into the wall. Mr. Richardson struggled with appellant while the other man ran outside for help. While Mr. Richardson and appellant continued to fight, one of the intruders reappeared and shot Mr. Richardson in the face.[3] One of the men hit Mr. Richardson on the head with a gun and then ran out of the apartment, leaving two guns behind. Mr. Richardson picked up the guns and chased after the intruders. He attempted to fire

1. D.C.Code §§ 22–2801, –4502 (2001) (AR); D.C.Code § 22–402 (2001) (ADW); D.C.Code §§ 22–404.1, –4502 (2001) (AAWA); D.C.Code § 22–4504(b) (2001) (PFCV); D.C.Code § 22–4504(a) (2001) (CPWL); D.C.Code § 7–2502.01 (2001) (UF); and D.C.Code § 7–2506.01(a)(3) (2001) (UA).

2. Dr. Mark Johnson, who treated Mr. Totev's knife wound, noted that the wound was about

an inch in diameter and that the knife came within millimeters of cutting the windpipe and major blood vessels.

3. Dr. Mark Bowyer treated Mr. Richardson and noted that there were three wounds: one below the right eye, where the bullet entered, one just below the jaw, where the bullet exited, and one below the right collar bone, where the bullet re-entered his body.

the guns, but they did not discharge. Mr. Richardson then went to the upstairs apartment unit where his landlord lived. The landlord yelled for her sister to call the police. The police arrived soon thereafter.

Mr. Totev testified that he saw appellant hit Mr. Richardson on the head with a gun, but that he did not see appellant with a gun at any other time. After Mr. Richardson chased the men outside, Mr. Totev freed his hands, went outside, and saw Mr. Richardson sitting outside the landlord's apartment holding two guns.

Officer Samuel Gaines arrived to find Mr. Richardson sitting on the steps outside covered in blood. Officer Gaines also saw Mr. Totev, who was covered in blood as well and running up and down the sidewalk in hysterics. Elsewhere in the area, another officer, Kimberly Dickerson, observed two men running and ordered them to stop. The men continued to run and Officer Dickerson issued a lookout for both men. Officers Frank Servis and Norman Ramon heard the broadcast and found appellant hiding in a nearby stairwell.[4]

Detective Adrian Owens conducted a show-up identification, whereby he brought appellant to the scene where Mr. Totev was being treated in an ambulance. Detective Owens stated that Mr. Totev was unable to identify appellant at that time. However, Mr. Totev later testified that he could not identify appellant at the show-up identification because he was in shock, but he was sure that appellant was the person who cut his throat. Detective Owens also conducted a photo identifica-

tion procedure with Mr. Richardson. Mr. Richardson picked two photographs from an array of nine, including one of appellant, and stated that the men looked like the intruders. Mr. Richardson further stated that the photo of appellant looked most like the person who had cut Mr. Totev's throat. Both Mr. Richardson and Mr. Totev also made in-court identifications of appellant.

Appellant's version of the story is that he was at Mr. Richardson's house as a guest and that he was also a victim of the incident. Appellant testified that he fled the scene after the attack because he was on parole and did not want to get in trouble. Appellant said that he discarded his sweatshirt, which was found on the ground near where he was apprehended, because his friend "Tommy," who was also at Mr. Richardson's apartment, told him that he had a lot of blood on it.[5] Later, appellant conceded that the discarded bloody boots, shirt, and jeans found in Mr. Richardson's apartment were also his. After the police took appellant to the scene for identification and questioned him, they drove him home. Police arrested appellant approximately three weeks later on February 26, 2004.

## II.

### A. Second Amendment Claims

■ Appellant argues that his convictions for CPWL, UF, and UA must be reversed in light of the Supreme Court's decision in *District of Columbia v. Heller,* —— U.S. ——, —— – ——, 128 S.Ct. 2783, 2822–23, 171 L.Ed.2d 637 (2008) (holding that the District of Columbia's "ban on

---

4. It does not appear that Officers Servis and Ramon found appellant based on Officer Dickerson's description. Officer Servis testified that he and Officer Ramon were responding to a call that came over the "radio air" and that they spotted a subject running in the location.

5. A forensic DNA examination of the sweatshirt showed that there was a mixture of Mr. Richardson's and appellant's DNA present, with appellant as the major contributor of DNA.

handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." (emphasis added)). But, appellant did not raise this claim in the trial court, therefore we review only for plain error. *See Sims v. United States,* 963 A.2d 147, 148 (D.C. 2008) (applying plain error analysis in light of *Heller*).

 Under plain error review, appellant must show that (1) there was an error, (2) the error was plain, and (3) the error affected his substantial rights. *United States v. Olano,* 507 U.S. 725, 733–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). "[I]n a case such as this—where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration." *Johnson v. United States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). Even if all three elements are met, we may exercise our discretion to notice the error only if it "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467, 117 S.Ct. 1544 (internal quotation marks and citations omitted).

Appellant argues that at the time of the offense, the CPWL, UF, and UA statutes functioned as a total ban on handguns because "the District unconstitutionally prohibited all registration and licensing of pistols by ordinary citizens, and thus the only way for an ordinary citizen to possess and carry a pistol was to do so without a license and registration."

We have rejected claims that the CPWL, UF, and UA statutes are facially invalid in light of the Supreme Court's decision in *Heller. See Brown v. United States,* 979 A.2d 630, 638–39 (D.C.2009); *Howerton v. United States,* 964 A.2d 1282, 1288 (D.C.2009); *Sims, supra,* 963 A.2d at 148–49. We have stated that "[n]otably, the Supreme Court in *Heller* did not declare invalid any of the individual statutes under which appellant ... was convicted. Moreover, to make a successful facial challenge to the statutes in issue here, appellant must establish that no set of circumstances exists under which [they would be valid]." *Howerton, supra,* 964 A.2d at 1288 (quoting *McPherson v. United States,* 692 A.2d 1342, 1344 (D.C.1997)) (internal quotations omitted). As an example, we pointed to the CPWL statute and noted that while the statute prohibited carrying a pistol without a license, it did not prohibit issuing a license to possess a gun in the home. *Id.* Therefore, we concluded that the statute was not facially unconstitutional because a set of circumstances exists where the statute could be valid. This same logic also applies to the UF and UA statutes. *Id.* at 1289 n. 12 (stating that "there does not appear to be anything facially improper" about the statute requiring firearms to be registered or the statute prohibiting possession of ammunition without a registration certificate for a firearm of the same caliber).

Even if we were to assume error,[6] that error must also be "plain." *Sims, supra,* 963 A.2d at 150. Appellant does not dem-

---

**6.** In two recent cases where the Second Amendment claims were preserved, *Brown, supra,* 979 A.2d 630, and *Plummer v. United States,* 983 A.2d 323 (D.C.2009), we considered whether the firearm statutes were unconstitutional "as applied" to each appellant. Here, however, the Second Amendment challenge was not preserved and we review only for plain error. Therefore, we can resolve the

appellant's claims without considering the factors relied upon in *Brown* and *Plummer,* such as whether the appellant is an ordinary citizen or whether appellant would have been precluded from registering the gun by the constitutionally valid statutory conditions such as criminal history, since in this case there is evidence in the record that appellant

onstrate that the constitutional error is "plain" as the CPWL, UF, and UA laws pertain to his conduct. *See Heller, supra,* —— U.S. ——, 128 S.Ct. 2783.

"In *Heller,* the issue was the constitutionality of the District of Columbia's ban on 'the possession of usable handguns *in the home,'"* specifically regarding "the right 'to use arms *in defense of* hearth and home.'" *Howerton, supra,* 964 A.2d at 1287 (quoting *Heller, supra,* 128 S.Ct. at 2821 (emphasis added)). In *Sims,* where appellant "was found to have carried and possessed a loaded ... pistol which he discarded while .... [outside] the boundary lines (or curtilage) of his home," 963 A.2d at 150, we held with regard to *Heller* that it was "not 'clear' and 'obvious' from the decision ... that it dictates an understanding of the Second Amendment which would compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined." *Id.* In *Howerton,* where appellant was in his home at the time he possessed the handgun, we held that his use of the handgun to threaten his girlfriend did not fall within the defense of home allowance of *Heller. See* 964 A.2d at 1287. The appellant's claim failed because "the jury found ... that he had used the gun in question to assault [the victim] and no evidence was presented that he possessed the gun for purposes of self-defense." *Id.*

In this case, Mr. Totev testified that he saw appellant hit Mr. Richardson on the head with a gun. And, Mr. Richardson testified that he was trying to get the gun away from appellant as they struggled. Appellant concedes that he was not in his own home. Thus, appellant was outside of the bounds identified in *Heller, i.e.,* the possession of a firearm in one's private residence for self-defense purposes.

Under these circumstances, and based on our decisions in *Howerton* and *Sims,* even if there were error in extending the CPWL, UF, or UA prohibitions to appellant's conduct, he cannot show that such error is "plain." Accordingly, appellant has not satisfied the first and second prong of the plain error analysis. Thus, we conclude appellant's CPWL, UF, and UA convictions must stand.

**B. Aiding and Abetting Instruction**

■ Appellant next argues that the trial court's aiding and abetting instruction was erroneous and that it warrants reversal of all of his convictions—AR, PFCV, CPWL, UF, UA, AAWA, and ADW. The government tried appellant as the principal, but requested that the trial court give an aiding and abetting instruction because there were three other men who participated in the robbery who might be considered principals.[7] The trial court gave the then-standard aiding and abetting jury instruction[8] which included the language:

was released on parole at the time of the offenses. However, even if there was error in applying the statutes to appellant, he must meet the other three prongs of plain error review before reversal is required. Since appellant cannot establish the plainness of any error in the application of the CPWL, UF, and UA statutes, we do not address the error prong at length.

7. The government may make a case against the same defendant under both a principal theory and an aider and abettor theory even though there is an ongoing debate "as to who, as between the defendant and someone else,

was the principal, so long as there is evidence that the defendant participated—in one capacity or the other—in the events that led to commission of the crime." *Tyree v. United States,* 942 A.2d 629, 637 (D.C.2008). "In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories." D.C.Code § 22–1805 (2001).

8. The current aiding and abetting instruction states in relevant part:

[a]n aider and abettor is legally responsible for the acts of other persons that are the *natural and probable consequence* of the crime in which he intentionally participates. An aider and abettor is legally responsible for the principal's use of a weapon during an offense if the aider and abettor had actual knowledge that some type of weapon would be used or if it was reasonably foreseeable to the aider and abettor that some type of weapon was required to commit the offense.

Appellant did not object to the aiding and abetting instruction. Where there is no objection to a jury instruction, this court reviews for plain error. *Kitt v. United States,* 904 A.2d 348, 355 n. 8 (D.C.2006). This is so even where the defendant is tried before the change in law that gives rise to his appellate claim. *Thomas v. United States,* 914 A.2d 1, 5–6 (D.C.2006).

██ Since the time of appellant's trial, we have rejected the use of the "natural and probable consequence" language in the aiding and abetting instruction for premeditated murder and other so-called "specific intent crimes." *Wilson–Bey v. United States,* 903 A.2d 818, 834, 837 (D.C. 2006); *Kitt, supra,* 904 A.2d at 356 (holding that *Wilson–Bey* applies to "other aiding and abetting situations in which an accomplice is charged with an offense requiring proof of specific intent"). We have held that the "natural and probable consequence" language in the aiding and abetting instruction is tantamount to a negligence standard. *Wilson–Bey, supra,* 903 A.2d at 834. Accordingly, we adopted the doctrine that "in order for a person to be held accountable for the specific intent of another under an aiding and abetting theo-

ry of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the charged crime." *Id.* (internal quotation marks and citation omitted). However, even assuming *arguendo* that it was erroneous to give the jury instruction in light of *Wilson–Bey,* appellant cannot establish that any error in the aiding and abetting instruction affected his substantial rights under the third prong of plain error review. To establish that the error affected his substantial rights, appellant "must show a reasonable probability that the aiding and abetting jury instruction had a prejudicial effect on the outcome of his trial." *Kidd v. United States,* 940 A.2d 118, 127 (D.C.2007) (citations omitted). After reviewing the record, we conclude that the instruction was harmless because there is overwhelming evidence in the record that appellant acted with the requisite mental state for each charge for which he was convicted—so much so, that there is no reasonable probability that the erroneous instruction affected the outcome. In evaluating potential prejudice, we must determine whether the erroneous aiding and abetting instruction undermined the *mens rea* requirement for each of appellant's convictions. *See, e.g., Wheeler v. United States,* 977 A.2d 973, 987 n. 34 (D.C.2009); *Lancaster v. United States,* 975 A.2d 168 (D.C.2009).

In *Lancaster,* we held that the appellant's substantial rights were not affected with respect to an erroneous aiding and abetting instruction on an armed robbery charge. *Id.* at 173. We noted that although the appellant had only watched the confrontation, she lured the victim to the apartment where he was robbed, and had

To find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated herself/himself with the commission of the crime, that s/he participated in the crime as

something s/he wished to bring about, and that s/he intended by her/his actions to make it succeed.

Criminal Jury Instructions for the District of Columbia, No. 4.02 (4th ed., rev.2008).

let the armed robbers into the apartment. *Id.* On that evidence, we held that there was no reasonable probability that the erroneous instruction caused her to be convicted without the jury finding that she shared the principals' specific intent to commit armed robbery. *Id.* at 174. We readily reach the same conclusion here. Here, there is ample evidence to indicate that appellant was an aider and abettor. Appellant entered Mr. Richardson's apartment with his confederates, searched Mr. Totev for money, bound his hands, took Mr. Totev's wallet, cell phone, and car keys, and cut Mr. Totev's throat after Mr. Richardson did not comply with appellant's demands for money. Appellant struggled with Mr. Richardson and then hit him on the head with a gun after another robber had shot him in the face. Thus, with respect to the armed robbery conviction, we are confident that appellant was not prejudiced by the erroneous jury instruction because the record indicates that appellant was an active participant in the robbery—if not the ring leader—and therefore had the requisite specific intent to steal.

With respect to PFCV, ADW, AAWA, CPWL, UF, and UA, we must determine whether there is any reasonable probability that a juror who credited the government's evidence could have failed to find that appellant "knowingly and intelligently" participated in the commission of these offenses.[9] Mr. Richardson identified appellant as the "initial agitator," meaning "he was the first person in" the apartment. Both victims testified that appellant bound Mr. Totev, obtained a knife from the kitchen, threatened to cut Mr. Totev's throat (and did in fact cut his throat), and stood guard over the victims while the others searched the apartment for money. When Mr. Richardson managed to break free from his bonds, appellant struggled with Mr. Richardson and ordered another one of the robbers to get help. Appellant managed to keep Mr. Richardson at bay long enough to allow the individual to return with a gun and shoot Mr. Richardson. Even more telling, Mr. Totev identified appellant in court as the man who cut his throat, and testified, that appellant had a gun during his struggle with Mr. Richardson, and appellant hit Mr. Richardson on

9. The jury instructions for each of these charges require the jury to find that each crime was committed "knowingly and intentionally"—with the exception of ADW, which uses the word "voluntarily." The term "voluntarily" may be considered akin to "knowingly and intentionally" where it is used consistently to define those terms throughout the criminal jury instructions for various crimes. The language "knowingly and intentionally" is defined throughout the jury instructions as meaning "consciously, *voluntarily,* and on purpose, not mistakenly, accidentally or inadvertently." *See* Criminal Jury Instructions for the District of Columbia, No. 4.75 (4th ed., rev.2008) (PFCV) (accused must possess the [firearm] *knowingly and intentionally*); Criminal Jury Instructions for the District of Columbia, No. 4.06A (4th ed., rev.2008) (AA) (accused must have *intentionally or knowingly* "engaged in conduct that created a grave risk of serious bodily injury to [complainant] and

which manifested an extreme indifference to human life"); Criminal Jury Instructions for the District of Columbia, No. 4.07A & B (4th ed., rev.2008) (ADW) (accused must have *voluntarily, on purpose* "made an attempt or effort, with force or violence to injure another person [or] committed a threatening act that reasonably would create in another person a fear of immediate injury"); Criminal Jury Instructions for the District of Columbia, No. 4.70 (4th ed., rev.2008) (CPWL) (accused must have "carried the pistol *knowingly and intentionally*"); Criminal Jury Instructions for the District of Columbia, No. 4.73 (4th ed., rev.2008) (UF) (accused must have *knowingly and intentionally* "possessed a firearm"); Criminal Jury Instructions for the District of Columbia, No. 4.74 (4th ed., rev.2008) (possession of ammunition) (accused must have possessed ammunition *"knowingly and intentionally"*) (emphasis added).

the head with it before fleeing. *See Dang v. United States,* 741 A.2d 1039, 1043 (D.C. 1999) (holding that a reasonable juror could find appellant had "aided and abetted in his co-defendants' possession of their guns" during an armed robbery where he "entered and exited the apartment with his co-defendants; . . . block[ed] the door, guard[ed] [a victim], and point[ed] a knife at [a victim]"). If credited, this evidence effectively establishes not only that he aided and abetted *knowingly and intentionally* in the possession of a firearm during a crime of violence (armed robbery), carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition, at a minimum, but that he was actually the principal.

If credited, the evidence also showed that appellant took several deliberate actions to aid his confederates who did possess firearms. Regarding the AAWA conviction, this evidence clearly establishes that while armed with a knife, appellant *knowingly and intentionally* "engaged in conduct which created a grave risk of serious bodily injury to [complainant] and which manifested an extreme indifference to human life." See note 9, *supra.* Additionally, concerning his ADW conviction, the evidence shows that while armed with a knife, appellant *voluntarily* "made an attempt or effort with force or violence to injure another person [or] committed a threatening act that reasonably would create in another person fear of immediate injury." See note 9, *supra.* On this record, we are satisfied that any reasonable

juror who credited the government's evidence would have concluded that appellant acted as a principal or with the same intent as the principal(s). Thus his substantial rights were not affected as a result of the erroneous aiding and abetting jury instruction.[10]

### C. Certificates of No Record

█ Appellant challenges the admission of the two certificates of no record of firearms registration and one certificate of no record of a license to carry a pistol ("CNRs"), because he contends that their admission undermined his rights conferred by the Confrontation Clause of the Sixth Amendment. Before resting its case, the government entered into evidence three CNRs (two PD–32 certificates showing no record of a firearm registration and one PD–36 certificate of no record to carry a pistol) into evidence after informing the court that it had provided the defense with a copy of each document in discovery. When defense counsel was asked by the court if he had any objections to entering the CNRs into evidence, he stated that he had none. Therefore, we review for plain error. *See Thomas, supra,* 914 A.2d at 8; *Johnson, supra,* 520 U.S. at 466–67, 117 S.Ct. 1544 (quoting *Olano, supra,* 507 U.S. at 732, 113 S.Ct. 1770). Because appellant cannot establish that any error in admitting the CNRs was "plain," we affirm appellant's convictions for CPWL, UF, and UA.

Appellant contends that his Confrontation Clause rights were violated because

---

10. Assuming *arguendo* that appellant's substantial rights were affected, we may notice the error only if it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Johnson, supra,* 520 U.S. at 469–70, 117 S.Ct. 1544 (holding that the "overwhelming" evidence on the record supported an affirmance of the conviction even if the appellant's substantial rights had been affected) (citation omitted). The record includes "overwhelming" evidence that appellant was an active participant in the armed robbery and accompanying convictions, thus we conclude that any error which may have affected his substantial rights did not "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings."

he did not have an opportunity to cross-examine the preparer of the CNRs. Relying on *Crawford v. Washington,* appellant asserts that the government was obligated to produce the preparer as a witness because the CNRs are testimonial in nature. 541 U.S. 36, 37, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding that introducing a prior recorded statement taken during a police interrogation without producing the witness who made the statement was a violation of the Confrontation Clause). He argues that the CNRs are testimonial because the purpose of the certificates is to establish the fact that he did not have a license to carry a pistol or registration for a firearm, and the certificates were prepared in anticipation of litigation.[11]

▇ We recently held that CNRs are testimonial. *Tabaka v. District of Columbia,* 976 A.2d 173, 175 (D.C.2009) (holding that in light of *Melendez–Diaz v. Massachusetts,* — U.S. —, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), CNRs are "inadmissible over objection without corresponding testimony [from the official] who had performed the search"). Accordingly, they are subject to the strictures of the Sixth Amendment. Therefore the admission of the CNRs into evidence constituted error

in light of *Melendez–Diaz.*[12] 129 S.Ct. at 2542; *Tabaka, supra,* 976 A.2d at 175–76. With respect to the "plainness" of the error, "[u]sually, the issue is whether the error was plain at the time of trial," *Thomas, supra,* 914 A.2d at 20 (citations omitted); however, we recognize an exception "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration." *Johnson, supra,* 520 U.S. at 468, 117 S.Ct. 1544. Appellant was convicted in 2005 (post-*Crawford, supra,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177) but at a time when "the governing law in this area was no longer settled" (and therefore "an objection would not necessarily have been futile"). *Thomas, supra,* 914 A.2d at 21 n. 26 (explaining that the "plain at the time of appellate consideration" exception does not apply). Therefore, for appellant to obtain relief upon plain error review, he must show that any error in the admission of the CNRs was plain at the time of his trial in 2005. That he cannot do.[13] For the foregoing reasons, appellant's convictions are affirmed.

*So ordered.*

---

11. Appellant further asserts that because the certificates are only generated in anticipation of prosecution and not kept regularly as part of the MPD's business records, they do not qualify under the business record exception to the hearsay rule.

12. In *Melendez–Diaz, supra,* 129 S.Ct. at 2539, Justice Scalia, writing for the 5–4 majority, stated that certificates which attest to the fact that a custodian of documents has "searched for a particular relevant record and failed to find it" are subject to the Confrontation Clause. While we are bound by *Tabaka,* we note that the specific issue of whether "certificates of no record" are subject to the Confrontation Clause was not before the Supreme Court in *Melendez–Diaz.* The Court's 5–4

holding only addressed whether "certificates of analysis" are subject to the Confrontation Clause. While we acknowledge that the majority opinion did state that certificates "attesting to the fact that the clerk had searched for a particular relevant record and failed to find it[ ]" would be "subject to confrontation[,]" it is notable that Justice Thomas's narrow concurring opinion expressly signed onto the majority opinion only with respect to "certificates of analysis," *"the documents at issue in this case."* See *Melendez–Diaz, supra,* 129 S.Ct. at 2539, 2543 (Thomas, J. concurring) (emphasis added).

13. However, even if appellant was able to establish that admission of the CNRs was plain error that affected his substantial rights,

reversal would not be required because, he cannot establish that the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Thomas, supra,* 914 A.2d at 22 (citing *Johnson, supra* 520 U.S. at 469–70, 117 S.Ct. 1544). The fourth prong is determined based on the facts of each case, and this case is similar to *Thomas* where we held that the Confrontation Clause error of admitting a DEA chemist's report without live testimony from the chemist who wrote it did not seriously affect the fairness, integrity or public reputation of the judicial proceedings because the appellant was provided with a copy of the DEA chemist report before trial and had the opportunity to challenge the report or subpoena and cross-examine the chemist. *See Thomas, supra,* 914 A.2d at 23. Similarly, appellant was provided with the CNRs during discovery and he could have subpoenaed and cross-examined the responsible person if he doubted the veracity of the CNR. Further, the issue of whether appellant had a license was "essentially uncontroverted," as appellant never alleged that he had a license. *See id.; Johnson, supra,* 520 U.S. at 469–70, 117 S.Ct. 1544. Appellant fails to show any unfairness as appellant does not demonstrate how the trial would have been affected had he been provided the opportunity to cross-examine the person who prepared the CNR. Therefore, the error did not rise to the level of requiring reversal of appellant's convictions for UA, UF, and CPWL.